# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JODY FINEFROCK, JULIA
FRANCIS, and SUSAN
BARNINGER, individually and on
behalf of a collective of others
similarly-situated,

        Plaintiffs,

        v.

FIVE GUYS OPERATIONS, LLC,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:16-cv-01221-
SHR

(Judge Sylvia H. Rambo)

*Electronically Filed*

## DECLARATION OF SARAH J. MILEY, ESQ.

I, Sarah J. Miley, declare as follows based on my personal knowledge:

1.    I am an Associate with the law firm of Littler Mendelson, P.C., counsel for Defendant, Five Guys Operations, LLC in this action. I am licensed to practice law in the Commonwealth of Pennsylvania. All information set forth herein is based upon my personal and firsthand knowledge. If called and sworn as a witness, I could and would competently testify hereto.

2.    Attached as Exhibit 1 is a true and correct copy of Plaintiffs' First Combined Requests for Production Directed to Five Guys Operations, LLC.

3.    Attached as Exhibit 2 is a true and correct copy of Plaintiff's Second Combined Requests for Production Directed to Five Guys Operations, LLC.

4.      Attached as Exhibit 3 is a true and correct copy of Plaintiff's First Combined Interrogatories Directed to Five Guys Operations, LLC.

5.      Attached as Exhibit 4 is a true and correct copy of Plaintiff's Second Combined Interrogatories Directed to Five Guys Operations, LLC.

6.      Attached as Exhibit 5 is a true and correct copy of Plaintiff's Notice of Deposition of Defendant Five Guys Operations, LLC Pursuant to Fed. R. Civ. P. 30(b)(6).

7.      Attached as Exhibit 6 is a true and correct copy of Defendant's Response to Plaintiffs' Second Combined Interrogatories.

8.      Attached as Exhibit 7 is a true and correct copy of the unpublished cases cited in Defendant's Brief in Opposition to Plaintiffs' Motion for Conditional Certification.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Respectfully submitted,

*/s/ Sarah J. Miley*
Sarah J. Miley
Associate, Littler Mendelson, P.C.

Date: December 13, 2017

Firmwide:151772107.1 070414.1028

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JODY FINEFROCK, JULIA FRANCIS, and SUSAN BARNINGER, individually and on behalf of a collective of others similarly-situated,<br><br>Plaintiffs,<br><br>v.<br><br>FIVE GUYS OPERATIONS, LLC,<br><br>Defendant. | Civil Action No. 1:16-cv-01221-SHR<br><br>(Judge Sylvia H. Rambo) |

## PLAINTIFFS' FIRST COMBINED REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO FIVE GUYS OPERATIONS, LLC

Pursuant to Federal Rule of Civil Procedure 34, Plaintiffs Jody Finefrock, Julia Francis, and Susan Barninger (collectively, "Plaintiffs") propound their First Combined Requests for Production of Documents Directed to Defendant Five Guys Operations, LLC ("Five Guys" or "Defendant"):

## DEFINITIONS

1.      "Class Period" refers to the three year period preceding the filing of the above-captioned matter and continuing through the present.

2.      "Opt-in" or "opt-in plaintiff" refers to any individual who files a consent to join form in the above-captioned matter.

3.      "Plaintiff(s)" or "Named Plaintiff(s)" collectively refers to Plaintiffs Jody Finefrock, Julia Francis, and Susan Barninger.

4.    "Five Guys," "Defendant," "you," or "you're" refers to Five Guys

Operations, LLC and its agents, insurers, successors, predecessors, affiliates,

subsidiaries, franchisees, and assigns, and its current and former directors, officers,

employees, shareholders, agents, managers, members, representatives, advisors,

and anyone else acting or purporting to act on its behalf.

5.    "Restaurant" refers to Defendant's corporate-owned restaurants in the

United States of America.

6.    "Concerning" or "regarding" means any Document which explicitly

or implicitly, in whole or in part, compare, were received in conjunction with, or

were generated as a result of the subject matter of the request, including all

Documents which reflect, refer, record, are in regard to, in connection with,

specify, memorialize, relate, describe, discuss, consider, constitute, embody,

evaluate, analyze, refer to, review, report on, comment on, impinge upon, or

impact the subject matter of the request.

7.    "Document" is defined to include any document and ESI stored in

any medium, and is synonymous in meaning and equal in scope to the usage of this

term in Federal Rule of Civil Procedure 34(a)(1)(A), including, without limitation,

electronic or computerized data compilations, electronic chats, instant messaging,

email communications, other electronically stored information from personal

computers, sound recordings, video recordings, photographs, and hard copy

2

documents maintained in files.

8.      "ESI" or "Electronically Stored Information" means information that is stored in electronic media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, without limitation, metadata, system data, deleted data, and fragmented data.

9.      "Identify," with respect to Persons (defined below), means to give, to the extent known, the Person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a Person has been identified in accordance with this paragraph, only the name of that Person need be listed in response to subsequent discovery requesting the identification of that Person.

10.     "Identify," with respect to Documents, means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; (d) author(s), (e) addressee(s), and (f) recipient(s).

11.     "Person" or "individual" means any natural person or any business, legal or governmental entity or association.

## INSTRUCTIONS

1.      You are requested to produce all Documents in your possession, custody, or control that are described below. In so doing, please furnish Documents

3

that are in the possession of your partners, officers, employees, attorneys, accountants, representatives, or agents, or that are otherwise subject to your custody or control.

2.     The production by one person, party, or entity of a document does not relieve another person, party, or entity from the obligation to produce his, her, or its own copy of that document, even if the two Documents are identical.

3.     In producing Documents, you are requested to produce a copy of each original Document together with a copy of all non-identical copies and drafts of that Document. If the original of any Document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

4.     Documents shall be produced as they are kept in the usual course of business. All Documents shall be produced with a copy of the file folder, envelope, or other container in which the Documents are kept or maintained. Documents shall be produced intact in their original files, without disturbing the organization of Documents employed during the conduct of the ordinary course of business and during the subsequent maintenance of the Documents.

5.     Documents shall be produced in accordance with the **Format for the Production of ESI and Paper Documents Converted to Electronic Format** attached hereto as **Schedule A**, which is incorporated as if set forth fully herein.

6.     Documents not otherwise responsive to this discovery request shall be produced if such Documents mention, discuss, refer to, or explain the Documents which are called for by this discovery request, or if such Documents are attached to Documents called for by this discovery request and constitute routing slips, transmittal memoranda, or letters, comments, evaluations or similar materials.

7.     Each Document requested herein is requested to be produced in its entirety and without deletion or excisions, regardless of whether you consider the entire Document to be relevant or responsive to this request. If you have redacted any portion of a Document, stamp the word "redacted" on each page of the Document that you have redacted.

8.     If any Document called for by these requests is not produced in full or is redacted on the ground that it is privileged or otherwise claimed to be protected against production, you are requested to provide the following information with respect to each such Document or redaction:

a.     its date;

b.     its author(s), its signatory(s) and each and every other person who prepared or participated in its preparation;

c.     the type of Document it is (e.g., letter, chart, memorandum, etc.);

d.     a description of its subject matter and length;

e.     a list of those persons and entities to whom said Document(s) was

disseminated, together with their last known addresses and the date or approximate date on which each such person or entity received it;

f.      a list of all other persons to whom the contents of the Document have been disclosed, the date such disclosure took place, the means of such disclosure, and the present location of the Document and all copies thereof;

g.      each and every person having custody or control of the Document and all copies thereof; and

h.      the nature of the privilege or other rule of law relied upon and any facts supporting your position in withholding production of each such Document.

9.      If you assert an objection to any request, you must nonetheless respond and produce any responsive Documents or ESI that are not subject to the stated objection. If you object to part of a request or category, you must specify the portion of the request to which you object, and must produce Documents responsive to the remaining parts of the request.

10.     Notwithstanding a claim that a Document is protected from disclosure, any Document so withheld must be produced with the portion claimed to be protected redacted.

11.     If any Document or ESI is known to have existed but no longer exists, has been destroyed, or is otherwise available, you must identify the Document or ESI, the reason for its loss, destruction or unavailability, the name of each person

known or reasonably believed by you to have present possession, custody, or control of the original and any copy thereof (if applicable), and a description of the disposition of each copy of the Document or ESI.

12.     The Named Plaintiffs, on behalf of themselves individually and the putative class, reserve the right to propound additional Requests for Production of Documents to Defendant.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      Documents constituting Plaintiff Jody Finefrock's personnel file, including all paystubs and wage statements.

**RESPONSE:**


2.      Documents constituting Plaintiff Julia Francis' personnel file, including all paystubs and wage statements.

**RESPONSE:**


3.      Documents constituting Plaintiff Susan Barninger's personnel file, including all paystubs and wage statements.

**RESPONSE:**


4.      Documents concerning or regarding an April 2015 meeting between Plaintiff Finefrock and Donnie Smith and Judy Lekki.

**RESPONSE:**


5.      Documents concerning or regarding Defendant's actions in placing Plaintiff Finefrock on a Performance Improvement Plan.

**RESPONSE:**

6.    Documents concerning or regarding any conversations or meetings between Plaintiff Francis and Andy Cook regarding Plaintiff' Francis' compensation compared to her male colleagues' compensation.

**RESPONSE:**

7.    Documents concerning or regarding an April 2015 meeting between Plaintiff Barninger and Donnie Smith.

**RESPONSE:**

8.    Documents concerning or regarding Defendant's actions in transferring Plaintiff Barninger to a different restaurant in 2015.

**RESPONSE:**

9.    Documents sufficient to demonstrate Defendant's restaurant-level (*i.e.*, inside the restaurant) management structure and chain of command during the Class Period.

**RESPONSE:**

10.    Documents sufficient to demonstrate Defendant's regional management structure from the restaurant level up through corporate officers during the Class Period.

**RESPONSE:**


11.    Documents constituting any of Defendant's policies and procedures that apply or applied to all of Defendant's corporate-owned restaurants nationwide during the Class Period.

**RESPONSE:**


12.    Documents constituting Defendant's employee handbooks, employee manuals, or other collection of employee policies and procedures that apply or applied to Defendant's corporate-owned restaurants nationwide during the Class Period.

**RESPONSE:**


13.    Documents constituting Defendant's policies and procedures for compensation of restaurant "red shirts" also referred to as "crew members" during the Class Period

**RESPONSE:**

14.     Documents constituting Defendant's policies and procedures for compensation of restaurant "shift leaders" during the Class Period

**RESPONSE:**

15.     Documents constituting Defendant's policies and procedures for compensation of restaurant "Assistant General Managers" during the Class Period

**RESPONSE:**

16.     Documents constituting Defendant's policies and procedures for compensation of restaurant "General Managers" during the Class Period

**RESPONSE:**

17.     Documents constituting Defendant's job descriptions for the position "red shirt" also referred to as "crew member" during the Class Period.

**RESPONSE:**

18.     Documents constituting Defendant's job descriptions for the position "shift leader" during the Class Period.

**RESPONSE:**

19.     Documents constituting Defendant's job descriptions for the position "Assistant General Manager" during the Class Period.

**RESPONSE:**

20.     Documents constituting Defendant's job descriptions for the position "General Manager" during the Class Period.

**RESPONSE:**

21.     Documents constituting Defendant's employee performance evaluation policies and procedures for the position "red shirt" also referred to as "crew member" during the Class Period.

**RESPONSE:**

22.     Documents constituting Defendant's employee performance evaluation policies and procedures for the position "shift leader" during the Class Period.

**RESPONSE:**

23.     Documents constituting Defendant's employee performance evaluation policies and procedures for the position "Assistant General Manager" during the Class Period.

**RESPONSE:**

24.     Documents constituting Defendant's employee performance evaluation policies and procedures for the position "General Manager" during the Class Period.

**RESPONSE:**

25.     Documents constituting any studies, audits, reviews, and/or analyses of Defendant's compensation for restaurant-level employees that analyzes compensation levels based on gender during the Class Period.

**RESPONSE:**

26.     Documents constituting any complaints from Defendant's female employees regarding lower compensation than men during the Class Period.

**RESPONSE:**

27.     Documents sufficient to demonstrate Defendant's paper and electronic document retention and destruction policy during the Class Period.

**RESPONSE:**

28.     Documents exchanged between Defendant and any expert witness Defendant plans to call to testify as a witness in this action.

**RESPONSE:**

29.    Any insurance policy that could provide coverage for any judgment entered in this action.

**RESPONSE:**


30.    Any statements provided by Plaintiffs Finefrock, Francis, or Barninger.

**RESPONSE:**


31.    Any audio, video, written, stenographic or photographic recordings or images of Plaintiffs Finefrock, Francis, or Barninger.

**RESPONSE:**


32.    Documents sufficient to demonstrate Defendant's policy for recording or documenting communications from employees to Human Resources.

**RESPONSE:**


33.    Documents constituting job descriptions and job responsibilities in effect during the Class Period for the District Manager, Area Manager, Director of Operations, and Director of Area Operations positions.

**RESPONSE:**

Dated April 14, 2017       Respectfully submitted,

**MCCARTHY WEISBERG CUMMINGS, P.C.**

By:   /s/ Larry A. Weisberg
Larry A. Weisberg    (PA Bar 83410)
Derrek W. Cummings    (PA Bar 83286)
2041 Herr Street
Harrisburg, PA 17103
Telephone:  (717) 260-3854
Facsimile:  (717) 233-8133
Email:     lweisberg@mwcfirm.com
          dcummings@mwcfirm.com

**STUEVE SIEGEL HANSON LLP**
George A. Hanson  (admitted *pro hac vice*)
Alexander T. Ricke (admitted *pro hac vice*)
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone:  (816) 714-7100
Facsimile:  (816) 714-7101
Email:     hanson@stuevesiegel.com
          ricke@stuevesiegel.com

ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE COLLECTIVE ACTION CLASS

## SCHEDULE A

**Format for the Production of ESI and Paper Documents Converted to Electronic Format**

**A. Definitions**

    i. "Document(s)" means anything subject to production or inspection under Federal Rule of Civil Procedure 34(a), including (1) any document or electronically stored information ("ESI") including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or (2) any tangible thing.

    ii. "Native File(s)" means ESI in the file type for (or of) the application in which such ESI is normally created, viewed and/or modified.

    iii. "Metadata" means: (i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; and (ii) information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted or otherwise manipulated by a user of such system.

    iv. "Static Image(s)" means a representation of ESI produced by converting a Native File into a standard image format capable of being viewed and printed on standard computer systems. A Tagged Image File Format (TIFF) image is an example of a Static Image.

    v. "Load/Unitization file" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachment ranges and parent/child relationships, and where each document begins and ends. A Load/Unitization file will also contain data relevant to the individual Documents, including extracted and user created Metadata, coded data, as well as paths to separate natives, OCR or Extracted Text files.

vi. "OCR" means the optical character recognition process which is conducted by software used in conjunction with image file types. The software is capable of generating text from image type documents and outputs textual data pulled from the original image based file. This can be used to extract text from scanned images, or prepare new text from redacted images.

vii. "Extracted Text" means the text extracted from a Native File.

## B. Form and Format for the Production of ESI and Paper Documents Converted to Electronic Form

i. Electronic Production of Paper Documents

1. Please produce any paper Documents, including spreadsheets maintained in paper form that have been scanned or otherwise converted into electronic form as of as of the date of this request. While you are under no obligation to convert paper documents into electronic form, if, you have converted paper documents into electronic form as of the date of this request, please produce those documents in accordance with the specifications contained herein.

2. Please produce such paper documents according to the following specifications:

   a. TIFF images, consistent with the specifications in Section B.ii.2.;

   b. The appropriate Load/Unitization files consistent with the specifications in Section B.v.1-2.; and

   c. Any searchable OCR text of scanned paper Documents, if any, consistent with the specifications in Section B.iv.1.

ii. Native Files to be Produced as Static Images

1. Except as otherwise stated below, please produce Native Files as Static Images together with Load/Unitization files as specified below.

2. Please include on all productions a separate folder that contains all image files that meet production requirements. TIFF images should be produced as single page, Black & White, Group IV TIFF (.TIFF) files at 300 x 300 dpi resolution and 8.5 x 11 inch page size. At times a color image may be requested due to illegible text/images or other necessary graphical information requiring use of a color rendering of the document. Upon request, you must produce the document in its original native format, or produce color image(s), as single page, color Joint Photographic Experts Group (.JPG) files with a corresponding image load file to supplement the original production. All TIFF or JPG image file names shall match the Bates number designated or branded to the image. All redactions will be clearly identified on the document image with a corresponding cross reference file identifying the production number of the page containing the redaction or page withheld for privilege and the reason for the redaction or privilege call.

3. All Static Image file names should match the Bates number assigned to the image.

iii. Production of Native Files

1. Please include on all productions a separate folder that contains all native files that meet production requirements. For all spreadsheet application files (e.g. MS Excel), presentation application files (e.g. MS PowerPoint), multimedia audio/video files (e.g. .wav, .mpeg, .avi), database application files (e.g. MS Access), and Source Code documents (e.g. .xml, .jar), please produce native files with the appropriate Load/Unitization and searchable OCR text as defined below.

2. However, if producing native files of database application files in original native format would be impracticable or result in a production of illegible or unusable documents, please create and produce export files in a native format to be mutually agreed (e.g., exporting from Oracle format to Access format or pipe-delimited flat file format, TBD). If the parties mutually agree that summary information derived from a database will suffice in lieu of native database files, please produce reports reasonably designed to identify and collect the relevant information. Such reports should be

produced as native files or static TIFF images with searchable OCR text. For each native file produced, please produce an accompanying placeholder image file indicating the document was produced in native format and, for each native file, include a corresponding record in the production .DAT file, including all applicable metadata fields.

iv.  Production of Searchable Text

1. Please include on all productions a separate folder that contains all extracted text files. Text files should be multi-page .TXT files with document level text for purposes of loading to a document review database. In the event text cannot be extracted from a document, the document must be made text searchable through the process of optical character recognition (OCR). Please also include the .LST file, commonly known as a Summation standard OCR load file.

v.  Production of Load/Unitization Files

1. Please include on all productions a standard .DAT file with Summation standard delimiters, including a header row identifying all agreed upon and required metadata fields. Please also include in the .DAT file, fields identifying the relative paths to all corresponding natives and text files. The .DAT file should be encoded in ASCII or Unicode formatting (to accommodate foreign language where applicable/required) using Summation standard default delimiters, (, comma and þ quote).

2. The second data file should be a cross-reference file that contains the corresponding image information. The acceptable formats for the cross-reference files are .DII or .OPT known commonly as a Summation standard image load file or an Opticon standard image load file. Image load files should indicate document breaks, relative path of image files, and should mirror formatting and composition of standard image load files as described above. Parent/child relationships must be identified and maintained.

vi.  Processing Specifications

1. When processing ESI, GMT should be selected as the time zone.

2. When processing ESI for review and for production in TIFF format, please instruct your vendor to force off Auto Date and force on hidden columns or rows, hidden worksheets, speaker notes, track changes, and comments.

vii. General

1. Please use reasonable efforts to avoid producing system and application files.

2. If all or any portion of a Static Image is redacted, redactions not clearly indicated on the Static Image should be noted in a user-generated field as specified in Exhibit A, which should be provided in the appropriate Load/Unitization file.

3. Please de-duplicate identical ESI either vertically, by custodian, or horizontally (i.e., globally).

## **Exhibit A**

### **Metadata Fields for Production**

Note: Metadata Field names may vary depending on the application which generates them. For example, Microsoft Outlook creates different Metadata Field names than does Lotus Notes. Accordingly, the chart below describes the Metadata Fields to be produced in generic, commonly used terms which you may adapt to the specific types of ESI it is producing. Any ambiguity about a Metadata Field is to be discussed prior to processing the subject ESI for production.

| Field | Definition | Doc Type |
|---|---|---|
| SOURCE | Name of party producing the document | All |
| CUSTODIAN | Name of person from whose files the document is produced | All |
| BEGBATES | Beginning Bates Number (production number) | All |
| ENDBATES | End Bates Number (production number) | All |

| PGCOUNT | Number of pages in the document | All |
|---|---|---|
| FILESIZE | File Size | All |
| APPLICAT | Application used to create document | All |
| FILEPATH | File source path for all electronically collected documents, which includes location, folder name, file name, and file source extension | All |
| NATIVEFILELINK | For documents provided in native format only | All |
| TEXTPATH | File path for OCR or Extracted Text files per paragraph (d) above | All |
| REDACTED | User-generated field that will indicated redactions made to Static Images, if such redactions are not clearly indicated on the Static Image | All |
| FOREIGNLANG | The existence of any foreign (non-English) language text in a document, as identified during processing or review by the producing party | All |
| HANDWRITING | The existence of any handwritten text in a document, as identified during processing or review by the producing party | All |
| MSGID | Hash or SHA Value for Emails | Email |
| FROM | Sender | Email |
| TO | Recipient | Email |
| CC | Additional Recipients | Email |
| BCC | Blind Additional Recipients | Email |
| SUBJECT | Subject line of email | Email |
| PARENTID | BegBates number for the parent document of a family (will only be populated for attachments and will not be populated for | All |

| | documents that are not part of a family) | |
|---|---|---|
| ATTACHMENTIDS | First Bates number of every attachment in the family range (i.e. Bates number of the first page of every attachment) – will be populated only for the parent document. | All |
| ATTACHCOUNT | Number of attachments to an email | Email |
| ATTACHNAME | Name of each individual attachment | Email |
| DATESENT (mm/dd/yyyy) | Date Sent | Email |
| TIMESENT | Time Sent | Email |
| DATERCVD | Date Received | Email |
| TIMERCVD | Time Received | Email |
| CAL_START | Calendar/ Appointment start date and time | Email, Various |
| MSGCLASS | Type of item, e.g. email, calendar item, contact, note, task | Email, Various |
| Attendees/Participants | Calendar/Appointment Attendees/Participants/Recipients | Email, Various |
| HASHVALUE | MD5 Hash or SHA Value for Edocs | Edocs |
| RECORDTYPE | Descriptive field created by the vendor processing software (e.g. email, edoc, image, attachment) | All |
| TITLE | Title field value extracted from the metadata of the native file. | Edocs |
| AUTHOR | Creator of a document | Edocs |
| DATECRTD (mm/dd/yyyy) | Creation Date | Edocs |
| TIMCRTD | Creation Time | Edocs |
| LASTAUTHOR | Last Saved field contained in the metadata of the native file | Edocs |
| LASTMODD (mm/dd/yyyy) | Last Modified Date | Edocs |

| LASTMODT | Last Modified Time | Edocs |
|---|---|---|
| FILEEXT | File extension of the native file (e.g., XLS, DOC, PDF) | All |
| MAILSTORE | Original path of mail store | Email, various |
| SENSITIVITY | Sensitivity field extracted from native email message other other Outlook item. | Email, various |
| CONVERSATION INDEX | Email thread identifier. | Email |

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JODY FINEFROCK, and JULIA
FRANCIS, individually and on behalf of a
collective of others similarly-situated,

        Plaintiffs,

v.

FIVE GUYS OPERATIONS, LLC,

        Defendant.

Civil Action No. 1:16-cv-01221-SHR

(Judge Sylvia H. Rambo)

### PLAINTIFFS' SECOND COMBINED REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO FIVE GUYS OPERATIONS, LLC

Pursuant to Federal Rule of Civil Procedure 34, Plaintiffs Jody Finefrock and Julia Francis (collectively, "Plaintiffs") propound their Second Combined Requests for Production of Documents Directed to Defendant Five Guys Operations, LLC ("Five Guys" or "Defendant"):

### DEFINITIONS

1.    "Class Period" refers to the three year period preceding the filing of the above-captioned matter and continuing through the present.

2.    "Opt-in" or "opt-in plaintiff" refers to any individual who files a consent to join form in the above-captioned matter.

3.    "Plaintiff(s)" or "Named Plaintiff(s)" collectively refers to Plaintiffs Jody Finefrock and Julia Francis.

4.     "Five Guys," "Defendant," "you," or "you're" refers to Five Guys

Operations, LLC and its agents, insurers, successors, predecessors, affiliates,

subsidiaries, franchisees, and assigns, and its current and former directors, officers,

employees, shareholders, agents, managers, members, representatives, advisors,

and anyone else acting or purporting to act on its behalf.

5.     "Restaurant" refers to Defendant's corporate-owned restaurants in the

United States of America.

6.     "Concerning" or "regarding" means any Document which explicitly

or implicitly, in whole or in part, compare, were received in conjunction with, or

were generated as a result of the subject matter of the request, including all

Documents which reflect, refer, record, are in regard to, in connection with,

specify, memorialize, relate, describe, discuss, consider, constitute, embody,

evaluate, analyze, refer to, review, report on, comment on, impinge upon, or

impact the subject matter of the request.

7.     "Document" is defined to include any document and ESI stored in

any medium, and is synonymous in meaning and equal in scope to the usage of this

term in Federal Rule of Civil Procedure 34(a)(1)(A), including, without limitation,

electronic or computerized data compilations, electronic chats, instant messaging,

email communications, other electronically stored information from personal

computers, sound recordings, video recordings, photographs, and hard copy

documents maintained in files.

8.     "ESI" or "Electronically Stored Information" means information that is stored in electronic media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, without limitation, metadata, system data, deleted data, and fragmented data.

9.     "Identify," with respect to Persons (defined below), means to give, to the extent known, the Person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a Person has been identified in accordance with this paragraph, only the name of that Person need be listed in response to subsequent discovery requesting the identification of that Person.

10.     "Identify," with respect to Documents, means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; (d) author(s), (e) addressee(s), and (f) recipient(s).

11.     "Pay scale" or "wage scale" means a graded scale of wages or salaries paid to a particular position within a particular organization.

12.     "Person" or "individual" means any natural person or any business, legal or governmental entity or association.

3

# INSTRUCTIONS

1.      You are requested to produce all Documents in your possession, custody, or control that are described below. In so doing, please furnish Documents that are in the possession of your partners, officers, employees, attorneys, accountants, representatives, or agents, or that are otherwise subject to your custody or control.

2.      The production by one person, party, or entity of a document does not relieve another person, party, or entity from the obligation to produce his, her, or its own copy of that document, even if the two Documents are identical.

3.      In producing Documents, you are requested to produce a copy of each original Document together with a copy of all non-identical copies and drafts of that Document. If the original of any Document cannot be located, a copy shall be provided in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

4.      Documents shall be produced as they are kept in the usual course of business. All Documents shall be produced with a copy of the file folder, envelope, or other container in which the Documents are kept or maintained. Documents shall be produced intact in their original files, without disturbing the organization of Documents employed during the conduct of the ordinary course of business and during the subsequent maintenance of the Documents.

**5.** Documents shall be produced in accordance with the **Format for the Production of ESI and Paper Documents Converted to Electronic Format** attached hereto as **Schedule A**, which is incorporated as if set forth fully herein.

6. Documents not otherwise responsive to this discovery request shall be produced if such Documents mention, discuss, refer to, or explain the Documents which are called for by this discovery request, or if such Documents are attached to Documents called for by this discovery request and constitute routing slips, transmittal memoranda, or letters, comments, evaluations or similar materials.

7. Each Document requested herein is requested to be produced in its entirety and without deletion or excisions, regardless of whether you consider the entire Document to be relevant or responsive to this request. If you have redacted any portion of a Document, stamp the word "redacted" on each page of the Document that you have redacted.

8. If any Document called for by these requests is not produced in full or is redacted on the ground that it is privileged or otherwise claimed to be protected against production, you are requested to provide the following information with respect to each such Document or redaction:

a. its date;

b. its author(s), its signatory(s) and each and every other person who prepared or participated in its preparation;

c.      the type of Document it is (e.g., letter, chart, memorandum, etc.);

d.      a description of its subject matter and length;

e.      a list of those persons and entities to whom said Document(s) was disseminated, together with their last known addresses and the date or approximate date on which each such person or entity received it;

f.      a list of all other persons to whom the contents of the Document have been disclosed, the date such disclosure took place, the means of such disclosure, and the present location of the Document and all copies thereof;

g.      each and every person having custody or control of the Document and all copies thereof; and

h.      the nature of the privilege or other rule of law relied upon and any facts supporting your position in withholding production of each such Document.

9.      If you assert an objection to any request, you must nonetheless respond and produce any responsive Documents or ESI that are not subject to the stated objection. If you object to part of a request or category, you must specify the portion of the request to which you object, and must produce Documents responsive to the remaining parts of the request.

10.     Notwithstanding a claim that a Document is protected from disclosure, any Document so withheld must be produced with the portion claimed

6

to be protected redacted.

11.    If any Document or ESI is known to have existed but no longer exists, has been destroyed, or is otherwise available, you must identify the Document or ESI, the reason for its loss, destruction or unavailability, the name of each person known or reasonably believed by you to have present possession, custody, or control of the original and any copy thereof (if applicable), and a description of the disposition of each copy of the Document or ESI.

12.    The Named Plaintiffs, on behalf of themselves individually and the putative class, reserve the right to propound additional Requests for Production of Documents to Defendant.

### **REQUESTS FOR PRODUCTION OF DOCUMENTS**

34.    Documents constituting pay scales or wage scales in effect at any time during the Class Period for the red shirt, shift leader, Assistant General Manager, and General Manager positions.

**RESPONSE:**

35.    Training, guidance, or policy and procedure documents in effect at any time during the Class Period regarding setting pay scales or wage scales, hourly wage rates, and salary rates for the red shirt, shift leader, Assistant General Manager, and General Manager positions.

**RESPONSE:**

7

36.     Documents concerning setting pay scales or wage scales, hourly wage rates, and salary rates during the Class Period for the red shirt, shift leader, Assistant General Manager, and General Manager positions.

**RESPONSE:**

Dated: September 8, 2017          Respectfully submitted,

**MCCARTHY WEISBERG CUMMINGS, P.C.**

By: /s/ Derrek W. Cummings
Derrek W. Cummings     (PA Bar 83286)
Larry A. Weisberg       (PA Bar 83410)
2041 Herr Street
Harrisburg, PA 17103
Telephone:  (717) 260-3854
Facsimile:   (717) 233-8133
Email:       dcummings@mwcfirm.com
             lweisberg@mwcfirm.com

**STUEVE SIEGEL HANSON LLP**

George A. Hanson  (admitted *pro hac vice*)
Alexander T. Ricke (admitted *pro hac vice*)
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone:  (816) 714-7100
Facsimile:   (816) 714-7101
Email:       hanson@stuevesiegel.com
             ricke@stuevesiegel.com

ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE COLLECTIVE ACTION CLASS

## SCHEDULE A

**Format for the Production of ESI and Paper Documents Converted to Electronic Format**

### A. Definitions

    i. "Document(s)" means anything subject to production or inspection under Federal Rule of Civil Procedure 34(a), including (1) any document or electronically stored information ("ESI") including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or (2) any tangible thing.

    ii. "Native File(s)" means ESI in the file type for (or of) the application in which such ESI is normally created, viewed and/or modified.

    iii. "Metadata" means: (i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; and (ii) information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted or otherwise manipulated by a user of such system.

    iv. "Static Image(s)" means a representation of ESI produced by converting a Native File into a standard image format capable of being viewed and printed on standard computer systems. A Tagged Image File Format (TIFF) image is an example of a Static Image.

    v. "Load/Unitization file" means an electronic file containing information identifying a set of paper-scanned images or processed ESI and indicating where individual pages or files belong together as documents, including attachment ranges and parent/child relationships, and where each document begins and ends. A Load/Unitization file will also contain data relevant to the individual Documents, including extracted and user created Metadata, coded data, as well as paths to separate natives, OCR or Extracted Text files.

vi. "OCR" means the optical character recognition process which is conducted by software used in conjunction with image file types. The software is capable of generating text from image type documents and outputs textual data pulled from the original image based file. This can be used to extract text from scanned images, or prepare new text from redacted images.

vii. "Extracted Text" means the text extracted from a Native File.

## B. Form and Format for the Production of ESI and Paper Documents Converted to Electronic Form

i. Electronic Production of Paper Documents

1. Please produce any paper Documents, including spreadsheets maintained in paper form that have been scanned or otherwise converted into electronic form as of as of the date of this request. While you are under no obligation to convert paper documents into electronic form, if, you have converted paper documents into electronic form as of the date of this request, please produce those documents in accordance with the specifications contained herein.

2. Please produce such paper documents according to the following specifications:

a. TIFF images, consistent with the specifications in Section B.ii.2.;

b. The appropriate Load/Unitization files consistent with the specifications in Section B.v.1-2.; and

c. Any searchable OCR text of scanned paper Documents, if any, consistent with the specifications in Section B.iv.1.

ii. Native Files to be Produced as Static Images

1. Except as otherwise stated below, please produce Native Files as Static Images together with Load/Unitization files as specified below.

2. Please include on all productions a separate folder that contains all image files that meet production requirements. TIFF images should be produced as single page, Black & White, Group IV TIFF (.TIFF) files at 300 x 300 dpi resolution and 8.5 x 11 inch page size. At times a color image may be requested due to illegible text/images or other necessary graphical information requiring use of a color rendering of the document. Upon request, you must produce the document in its original native format, or produce color image(s), as single page, color Joint Photographic Experts Group (.JPG) files with a corresponding image load file to supplement the original production. All TIFF or JPG image file names shall match the Bates number designated or branded to the image. All redactions will be clearly identified on the document image with a corresponding cross reference file identifying the production number of the page containing the redaction or page withheld for privilege and the reason for the redaction or privilege call.

3. All Static Image file names should match the Bates number assigned to the image.

iii. Production of Native Files

1. Please include on all productions a separate folder that contains all native files that meet production requirements. For all spreadsheet application files (e.g. MS Excel), presentation application files (e.g. MS PowerPoint), multimedia audio/video files (e.g. .wav, .mpeg, .avi), database application files (e.g. MS Access), and Source Code documents (e.g. .xml, .jar), please produce native files with the appropriate Load/Unitization and searchable OCR text as defined below.

2. However, if producing native files of database application files in original native format would be impracticable or result in a production of illegible or unusable documents, please create and produce export files in a native format to be mutually agreed (e.g., exporting from Oracle format to Access format or pipe-delimited flat file format, TBD). If the parties mutually agree that summary information derived from a database will suffice in lieu of native database files, please produce reports reasonably designed to identify and collect the relevant information. Such reports should

12

be produced as native files or static TIFF images with searchable OCR text. For each native file produced, please produce an accompanying placeholder image file indicating the document was produced in native format and, for each native file, include a corresponding record in the production .DAT file, including all applicable metadata fields.

iv. Production of Searchable Text

1. Please include on all productions a separate folder that contains all extracted text files. Text files should be multi-page .TXT files with document level text for purposes of loading to a document review database. In the event text cannot be extracted from a document, the document must be made text searchable through the process of optical character recognition (OCR). Please also include the .LST file, commonly known as a Summation standard OCR load file.

v. Production of Load/Unitization Files

1. Please include on all productions a standard .DAT file with Summation standard delimiters, including a header row identifying all agreed upon and required metadata fields. Please also include in the .DAT file, fields identifying the relative paths to all corresponding natives and text files. The .DAT file should be encoded in ASCII or Unicode formatting (to accommodate foreign language where applicable/required) using Summation standard default delimiters, (, comma and þ quote).

2. The second data file should be a cross-reference file that contains the corresponding image information. The acceptable formats for the cross-reference files are .DII or .OPT known commonly as a Summation standard image load file or an Opticon standard image load file. Image load files should indicate document breaks, relative path of image files, and should mirror formatting and composition of standard image load files as described above. Parent/child relationships must be identified and maintained.

vi. Processing Specifications

1. When processing ESI, GMT should be selected as the time zone.

2. When processing ESI for review and for production in TIFF format, please instruct your vendor to force off Auto Date and force on hidden columns or rows, hidden worksheets, speaker notes, track changes, and comments.

vii. General

1. Please use reasonable efforts to avoid producing system and application files.

2. If all or any portion of a Static Image is redacted, redactions not clearly indicated on the Static Image should be noted in a user-generated field as specified in Exhibit A, which should be provided in the appropriate Load/Unitization file.

3. Please de-duplicate identical ESI either vertically, by custodian, or horizontally (i.e., globally).

<u>Exhibit A</u>

<u>Metadata Fields for Production</u>

Note: Metadata Field names may vary depending on the application which generates them. For example, Microsoft Outlook creates different Metadata Field names than does Lotus Notes. Accordingly, the chart below describes the Metadata Fields to be produced in generic, commonly used terms which you may adapt to the specific types of ESI it is producing. Any ambiguity about a Metadata Field is to be discussed prior to processing the subject ESI for production.

| Field | Definition | Doc Type |
|-------|-----------|----------|
| SOURCE | Name of party producing the document | All |
| CUSTODIAN | Name of person from whose files the document is produced | All |
| BEGBATES | Beginning Bates Number (production number) | All |
| ENDBATES | End Bates Number (production number) | All |
| PGCOUNT | Number of pages in the document | All |
| FILESIZE | File Size | All |
| APPLICAT | Application used to create document | All |
| FILEPATH | File source path for all electronically collected documents, which includes location, folder name, file name, and file source extension | All |
| NATIVEFILELINK | For documents provided in native format only | All |
| TEXTPATH | File path for OCR or Extracted Text files per paragraph (d) above | All |
| REDACTED | User-generated field that will indicated redactions made to Static Images, if such redactions are not clearly indicated on the Static Image | All |

| | | |
|---|---|---|
| FOREIGNLANG | The existence of any foreign (non-English) language text in a document, as identified during processing or review by the producing party | All |
| HANDWRITING | The existence of any handwritten text in a document, as identified during processing or review by the producing party | All |
| MSGID | Hash or SHA Value for Emails | Email |
| FROM | Sender | Email |
| TO | Recipient | Email |
| CC | Additional Recipients | Email |
| BCC | Blind Additional Recipients | Email |
| SUBJECT | Subject line of email | Email |
| PARENTID | BegBates number for the parent document of a family (will only be populated for attachments and will not be populated for documents that are not part of a family) | All |
| ATTACHMENTIDS | First Bates number of every attachment in the family range (i.e. Bates number of the first page of every attachment) – will be populated only for the parent document. | All |
| ATTACHCOUNT | Number of attachments to an email | Email |
| ATTACHNAME | Name of each individual attachment | Email |
| DATESENT (mm/dd/yyyy) | Date Sent | Email |
| TIMESENT | Time Sent | Email |
| DATERCVD | Date Received | Email |
| TIMERCVD | Time Received | Email |
| CAL_START | Calendar/ Appointment start date and time | Email, Various |

16

| MSGCLASS | Type of item, e.g. email, calendar item, contact, note, task | Email, Various |
|---|---|---|
| Attendees/Participants | Calendar/Appointment Attendees/Participants/Recipients | Email, Various |
| HASHVALUE | MD5 Hash or SHA Value for Edocs | Edocs |
| RECORDTYPE | Descriptive field created by the vendor processing software (e.g. email, edoc, image, attachment) | All |
| TITLE | Title field value extracted from the metadata of the native file. | Edocs |
| AUTHOR | Creator of a document | Edocs |
| DATECRTD (mm/dd/yyyy) | Creation Date | Edocs |
| TIMCRTD | Creation Time | Edocs |
| LASTAUTHOR | Last Saved field contained in the metadata of the native file | Edocs |
| LASTMODD (mm/dd/yyyy) | Last Modified Date | Edocs |
| LASTMODT | Last Modified Time | Edocs |
| FILEEXT | File extension of the native file (e.g., XLS, DOC, PDF) | All |
| MAILSTORE | Original path of mail store | Email, various |
| SENSITIVITY | Sensitivity field extracted from native email message other other Outlook item. | Email, various |
| CONVERSATION INDEX | Email thread identifier. | Email |

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September 2017, a true and correct copy of the foregoing Plaintiffs' Second Combined Requests for Production of Documents Directed to Defendant Five Guys Operations, LLC was served via e-mail upon the following counsel of record:

**Theodore A. Schroeder, Esquire**
**tschroeder@littler.com**

**Emilie R. Hammerstein, Esquire**
**ehammerstein@littler.com**

**Sarah J. Miley, Esquire**
**smiley@littler.com**

**LITTLER MENDELSON, P.C.**
**625 Liberty Avenue, 26th Floor**
**Pittsburgh, PA 15222**

*Counsel for Defendant*

/s/ Derrek W. Cummings
Derrek W. Cummings

# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JODY FINEFROCK, JULIA FRANCIS,
and SUSAN BARNINGER, individually
and on behalf of a collective of others
similarly-situated,

                Plaintiffs,

v.

FIVE GUYS OPERATIONS, LLC,

                Defendant.

Civil Action No. 1:16-cv-01221-SHR

(Judge Sylvia H. Rambo)

## PLAINTIFFS' FIRST COMBINED INTERROGATORIES
## DIRECTED TO FIVE GUYS OPERATIONS, LLC

Pursuant to Federal Rule of Civil Procedure 33, Plaintiffs Jody Finefrock, Julia Francis, and Susan Barninger (collectively, "Plaintiffs") propound their First Combined Interrogatories Directed to Defendant Five Guys Operations, LLC ("Five Guys" or "Defendant"):

## DEFINITIONS

1.    "Class Period" refers to the three year period preceding the filing of the above-captioned matter and continuing through the present.

2.    "Opt-in" or "opt-in plaintiff" refers to any individual who files a consent to join form in the above-captioned matter.

3.    "Plaintiff(s)" or "Named Plaintiff(s)" collectively refers to Plaintiffs Jody Finefrock, Julia Francis, and Susan Barninger.

4.   "Five Guys," "Defendant," "you," or "you're" refers to Five Guys

Operations, LLC and its agents, insurers, successors, predecessors, affiliates,

subsidiaries, franchisees, and assigns, and its current and former directors, officers,

employees, shareholders, agents, managers, members, representatives, advisors,

and anyone else acting or purporting to act on its behalf.

5.   "Restaurant" refers to Defendant's corporate-owned restaurants in the

United States of America.

6.   "Concerning" or "regarding" means any Document which explicitly

or implicitly, in whole or in part, compare, were received in conjunction with, or

were generated as a result of the subject matter of the request, including all

Documents which reflect, refer, record, are in regard to, in connection with,

specify, memorialize, relate, describe, discuss, consider, constitute, embody,

evaluate, analyze, refer to, review, report on, comment on, impinge upon, or

impact the subject matter of the request.

7.   "Document" is defined to include any document and ESI stored in

any medium, and is synonymous in meaning and equal in scope to the usage of this

term in Federal Rule of Civil Procedure 34(a)(1)(A), including, without limitation,

electronic or computerized data compilations, electronic chats, instant messaging,

email communications, other electronically stored information from personal

computers, sound recordings, video recordings, photographs, and hard copy

documents maintained in files.

8.    "ESI" or "Electronically Stored Information" means information that is stored in electronic media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, without limitation, metadata, system data, deleted data, and fragmented data.

9.    "Identify," with respect to Persons (defined below), means to give, to the extent known, the Person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a Person has been identified in accordance with this paragraph, only the name of that Person need be listed in response to subsequent discovery requesting the identification of that Person.

10.    "Identify," with respect to Documents, means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; (d) author(s), (e) addressee(s), and (f) recipient(s).

11.    "Person" or "individual" means any natural person or any business, legal or governmental entity or association.

## INTERROGATORIES

1.     For each employment position that Plaintiff Finefrock held with Defendant during the Class Period, state her rate and method (*i.e.*, hourly wages, salary, etc.) of compensation and the start and end date that she had that rate and method of compensation.

**RESPONSE:**


2.     For each employment position that Plaintiff Francis held with Defendant during the Class Period, state her rate and method (*i.e.*, hourly wages, salary, etc.) of compensation and the start and end date that she had that rate and method of compensation.

**RESPONSE:**


3.     For each employment position that Plaintiff Barninger held with Defendant during the Class Period, state her rate and method (*i.e.*, hourly wages, salary, etc.) of compensation and the start and end date that she had that rate and method of compensation.

**RESPONSE:**

4.    Describe the corporate-owned restaurant level management structure and chain of command.

**RESPONSE:**


5.    Describe the corporate-owned restaurant management structure and chain of command above the restaurant level (*i.e.*, to whom does the restaurant general manager report, to whom in turn does the position level supervising the restaurant general manger report, and so on to the top of Defendant's corporate management).

**RESPONSE:**


6.    Identify in a Microsoft Excel document all putative Equal Pay Act Collective Members (as the Collective is defined in the Complaint) by employee ID number, gender, restaurant(s)/store number(s) where employed, employment position, and rate(s) and method(s) of compensation.

**RESPONSE:**

7.     For each year during the Class Period, identify the total number of employees and number of female employees in the crew member or red shirt position in Defendant's corporate-owned restaurants.

**RESPONSE:**

8.     For each year during the Class Period, identify the total number of employees and number of female employees in the shift leader position in Defendant's corporate-owned restaurants.

**RESPONSE:**

9.     For each year during the Class Period, identify the total number of employees and number of female employees in the Assistant General Manager position in Defendant's corporate-owned restaurants.

**RESPONSE:**

10.    For each year during the Class Period, identify the total number of employees and number of female employees in the General Manager position in Defendant's corporate-owned restaurants.

**RESPONSE:**

11.    Identify by restaurant number/store number, address, and dates of existence, each of Defendant's corporate-owned restaurants in the United States of America.  If the restaurant was in existence during the Class Period, Defendant may so indicate rather than stating its dates of existence.

**RESPONSE:**


12.    Identify all efforts undertaken by Defendants during the Class Period to ensure compliance with the Equal Pay Act.

**RESPONSE:**


13.    Identify by name, position title (and dates in each position), and area or region under the person's management, each District Manager, Area Manager, Director of Area Operations, and Director of Operations with responsibility over Defendant's corporate-owned stores during the Class Period.

**RESPONSE:**

14.   Identify by name, telephone number, address, employment position with Defendant (if applicable), and knowledge Defendant believes possessed by this person, each person Defendant believes or knows has personal knowledge of the facts discussed in Plaintiff's operative Complaint or Defendant's operative Answer.

**RESPONSE:**

Dated April 14, 2017          Respectfully submitted,

**MCCARTHY WEISBERG CUMMINGS, P.C.**

By:   /s/ Larry A. Weisberg
Larry A. Weisberg        (PA Bar 83410)
Derrek W. Cummings    (PA Bar 83286)
2041 Herr Street
Harrisburg, PA 17103
Telephone:  (717) 260-3854
Facsimile:   (717) 233-8133
Email:        lweisberg@mwcfirm.com
                 dcummings@mwcfirm.com

**STUEVE SIEGEL HANSON LLP**
George A. Hanson  (admitted *pro hac vice*)
Alexander T. Ricke (admitted *pro hac vice*)
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone:  (816) 714-7100
Facsimile:   (816) 714-7101
Email:        hanson@stuevesiegel.com
                 ricke@stuevesiegel.com

ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE COLLECTIVE ACTION CLASS

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JODY FINEFROCK, and JULIA FRANCIS, individually and on behalf of a collective of others similarly-situated,<br><br>  Plaintiffs,<br><br>v.<br><br>FIVE GUYS OPERATIONS, LLC,<br><br>  Defendant. | Civil Action No. 1:16-cv-01221-SHR<br><br>(Judge Sylvia H. Rambo) |

## PLAINTIFFS' SECOND COMBINED INTERROGATORIES DIRECTED TO FIVE GUYS OPERATIONS, LLC

Pursuant to Federal Rule of Civil Procedure 33, Plaintiffs Jody Finefrock, and Julia Francis (collectively, "Plaintiffs") propound their Second Combined Interrogatories Directed to Defendant Five Guys Operations, LLC ("Five Guys" or "Defendant"):

## DEFINITIONS

1.      "Class Period" refers to the three year period preceding the filing of the above-captioned matter and continuing through the present.

2.      "Opt-in" or "opt-in plaintiff" refers to any individual who files a consent to join form in the above-captioned matter.

3.      "Plaintiff(s)" or "Named Plaintiff(s)" collectively refers to Plaintiffs Jody Finefrock and Julia Francis.

4.     "Five Guys," "Defendant," "you," or "you're" refers to Five Guys Operations, LLC and its agents, insurers, successors, predecessors, affiliates, subsidiaries, franchisees, and assigns, and its current and former directors, officers, employees, shareholders, agents, managers, members, representatives, advisors, and anyone else acting or purporting to act on its behalf.

5.     "Restaurant" refers to Defendant's corporate-owned restaurants in the United States of America.

6.     "Concerning" or "regarding" means any Document which explicitly or implicitly, in whole or in part, compare, were received in conjunction with, or were generated as a result of the subject matter of the request, including all Documents which reflect, refer, record, are in regard to, in connection with, specify, memorialize, relate, describe, discuss, consider, constitute, embody, evaluate, analyze, refer to, review, report on, comment on, impinge upon, or impact the subject matter of the request.

7.     "Document" is defined to include any document and ESI stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A), including, without limitation, electronic or computerized data compilations, electronic chats, instant messaging, email communications, other electronically stored information from personal computers, sound recordings, video recordings, photographs, and hard copy

documents maintained in files.

8.     "ESI" or "Electronically Stored Information" means information that is stored in electronic media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, without limitation, metadata, system data, deleted data, and fragmented data.

9.     "Identify," with respect to Persons (defined below), means to give, to the extent known, the Person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a Person has been identified in accordance with this paragraph, only the name of that Person need be listed in response to subsequent discovery requesting the identification of that Person.

10.    "Identify," with respect to Documents, means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; (d) author(s), (e) addressee(s), and (f) recipient(s).

11.    "Pay scale" or "wage scale" means a graded scale of wages or salaries paid to a particular position within a particular organization.

12.    "Person" or "individual" means any natural person or any business, legal or governmental entity or association.

## INTERROGATORIES

15.    Describe the process or processes (and the position levels involved in those processes) that Five Guys used during the Class Period to determine the hourly rate of pay or salary wage for the red shirt, shift leader, Assistant General Manager, and General Manager positions.

**RESPONSE:**

16.    Identify any pay scales or wage scales that Five Guys has had in place for the red shirt, shift leader, Assistant General Manager, and General Manager positions at any time during the Class Period.  For each pay scale or wage scale identified, identify the timeframes and geographic locations in which that pay scale or wage scale was in effect.

**RESPONSE:**

17.    State with specificity what employee position(s) level(s) within the Five Guys' organization have had the authority to determine the pay rate for the red shirt, shift leader, Assistant General Manager, and/or General Manager positions, respectively, at any time during the Class Period.  For each position identified, identify the applicable timeframes during the Class Period that each position had that ability.

**RESPONSE:**

18.    For each hourly rate of pay or salary wage that Plaintiff Finefrock and Plaintiff Francis received from Five Guys during the Class Period, state with specificity how each such hourly rate of pay or salary wage was determined and identify the person(s) within the Five Guys organization who made the decision to set the hourly rate of pay or salary wage.

**RESPONSE:**

Dated: September 8, 2017          Respectfully submitted,

**MCCARTHY WEISBERG CUMMINGS, P.C.**

By: /s/ Derrek W. Cummings
Derrek W. Cummings      (PA Bar 83286)
Larry A. Weisberg        (PA Bar 83410)
2041 Herr Street
Harrisburg, PA 17103
Telephone:  (717) 260-3854
Facsimile:   (717) 233-8133
Email:        dcummings@mwcfirm.com
                lweisberg@mwcfirm.com

**STUEVE SIEGEL HANSON LLP**

George A. Hanson  (admitted *pro hac vice*)
Alexander T. Ricke (admitted *pro hac vice*)
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone:  (816) 714-7100
Facsimile:   (816) 714-7101
Email:        hanson@stuevesiegel.com
                ricke@stuevesiegel.com

ATTORNEYS FOR PLAINTIFFS AND THE
PUTATIVE COLLECTIVE ACTION CLASS

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of September 2017, a true and correct copy of the foregoing Plaintiffs' Second Combined Interrogatories Directed to Defendant Five Guys Operations, LLC was served via e-mail upon the following counsel of record:

**Theodore A. Schroeder, Esquire**
**tschroeder@littler.com**

**Emilie R. Hammerstein, Esquire**
**ehammerstein@littler.com**

**Sarah J. Miley, Esquire**
**smiley@littler.com**

**LITTLER MENDELSON, P.C.**
**625 Liberty Avenue, 26th Floor**
**Pittsburgh, PA 15222**

*Counsel for Defendant*

/s/ Derrek W. Cummings
Derrek W. Cummings

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JODY FINEFROCK, and JULIA FRANCIS, individually and on behalf of a collective of others similarly-situated,<br><br>    Plaintiffs,<br><br>v.<br><br>FIVE GUYS OPERATIONS, LLC,<br><br>    Defendant. | Civil Action No. 1:16-cv-01221-SHR<br><br>(Judge Sylvia H. Rambo) |

**PLAINTIFFS' NOTICE OF DEPOSITION OF
DEFENDANT FIVE GUYS OPERATIONS, LLC
<u>PURSUANT TO FED. R. CIV. P. 30(b)(6)</u>**

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30(b)(6), Plaintiffs Jody Finefrock and Julia Francis will cause to be taken the deposition of Defendant Five Guys Operations, LLC ("Five Guys"), by a person or persons designated by Five Guys, before a court reporter authorized by law to administer oaths. The deposition will begin at 9:00 a.m. on October 9, 2017 at the offices of Littler Mendelson P.C., 625 Liberty Avenue, 26th Floor, Pittsburgh, PA 15222. To the extent necessary, agreed to by the parties, or otherwise permitted by the Court, the deposition shall continue from day to day until completed. The deposition shall be recorded by stenographic means.

Five Guys shall designate one or more officers, directors, managing agents, or other persons to testify on its behalf, and shall set forth, for each person

designated, the matter on which the person will testify.   The person(s) so designated by Five Guys shall testify on matters known or reasonably available to Five Guys as listed below in Exhibit A, attached and incorporated herein.   Each such designee produced to so testify has an affirmative duty to review relevant documents, reports, and other matters known or reasonably known or available to Five Guys, along with familiarizing him or herself with relevant witnesses known or reasonably available (not just current employees) to provide informed, binding answers at the deposition.

Respectfully submitted,

**MCCARTHY WEISBERG CUMMINGS, P.C.**

Dated September 25, 2017          By: */s/ Derrek W. Cummings*
                                            Derrek W. Cummings     (PA Bar 83286)
                                            Larry A. Weisberg     (PA Bar 83410)
                                            2041 Herr Street
                                            Harrisburg, PA 17103
                                            Phone: (717) 238-5707   Fax: (717) 233-8133
                                            Email:     dcummings@mwcfirm.com
                                                         lweisberg@mwcfirm.com

**STUEVE SIEGEL HANSON LLP**
George A. Hanson (admitted *pro hac vice*)
Alexander T. Ricke (admitted *pro hac vice*)
460 Nichols Road, Suite 200
Kansas City, MO 64112
Phone: (816) 714-7100   Fax: (816) 714-7101
Email:     hanson@stuevesiegel.com
             ricke@stuevesiegel.com

*ATTORNEYS FOR PLAINTIFFS AND THE*
*PUTATIVE COLLECTIVE ACTION CLASS*

## EXHIBIT A

## DEFINITIONS

1.      "Action" means the proceedings in *Francis, et al., v. Five Guys Operations, LLC*, 1:16-cv-01221-SHR (M.D. Pa.).

2.      "Five Guys Operations, LLC," "Five Guys," "Defendant," "you," or "your" means Defendant Five Guys Operations, LLC.

3.      "Class Period" refers to the three year period preceding the filing of the above-captioned matter and continuing through the present.

4.      "Concerning" or "regarding" means any Document which explicitly or implicitly, in whole or in part, compare, were received in conjunction with, or were generated as a result of the subject matter of the request, including all Documents which reflect, refer, record, are in regard to, in connection with, specify, memorialize, relate, describe, discuss, consider, constitute, embody, evaluate, analyze, refer to, review, report on, comment on, impinge upon, or impact the subject matter of the request.

5.      "Document" is defined to include any document and ESI stored in any medium, and is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a)(1)(A), including, without limitation, electronic or computerized data compilations, electronic chats, instant messaging, email communications, other electronically stored information from personal

computers, sound recordings, video recordings, photographs, and hard copy documents maintained in files.

6.    "ESI" or "Electronically Stored Information" means information that is stored in electronic media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, without limitation, metadata, system data, deleted data, and fragmented data.

7.    "Identify," with respect to Persons (defined below), means to give, to the extent known, the Person's full name, present or last known address, and when referring to a natural person, additionally, the present or last known place of employment. Once a Person has been identified in accordance with this paragraph, only the name of that Person need be listed in response to subsequent discovery requesting the identification of that Person.

8.    "Identify," with respect to Documents, means to give, to the extent known, the (a) type of document; (b) general subject matter; (c) date of the document; (d) author(s), (e) addressee(s), and (f) recipient(s).

9.    "Person" or "individual" means any natural person or any business, legal or governmental entity or association.

## DEPOSITION TOPICS

1.      With respect to Five Guys' corporate-owned restaurants, the organizational management structure and chain-of-command reporting structure of Five Guys' district, area, regional, and national management in existence during the Class Period.

2.      With respect to Five Guys' corporate-owned restaurants, Five Guys' policies and procedures for setting restaurant-level employee pay during the Class Period.

3.      With respect to Five Guys' corporate-owned restaurants, the restaurant-level employment positions in existence during the Class Period and their job responsibilities.

4.      With respect to each restaurant-level employment position at Five Guys' corporate-owned restaurants in existence during the Class Period, the identities of the Five Guys' employment positions with the responsibility and/or authority to set that restaurant-level employment position's pay during the Class Period.

5.      With respect to Five Guys' corporate-owned restaurants, any pay scale or wage scales for restaurant-level employees during the Class Period.

6.      With respect to Five Guys' corporate-owned restaurants, any Equal Pay Act compliance efforts under taken by Five Guys during the Class Period, including since this case was filed.

7.      The manner in which Five Guys has stored corporate-owned restaurant employee pay data during the Class Period.

8.      The existence, location, and preservation of documents responsive to Plaintiff's Requests for Production of Documents.

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving a copy of the foregoing Plaintiffs'
Notice of Deposition of Defendant Five Guys Operations, LLC Pursuant to
Fed.R.Civ.P.30(b)(6) upon the person and in the manner indicated below by e-
mail:

**Theodore A. Schroeder, Esquire**
*tschroeder@littler.com*

**Emilie R. Hammerstein, Esquire**
*ehammerstein@littler.com*

**Sarah J. Miley, Esquire**
*smiley@littler.com*

*Counsel for Defendant*


McCarthy Weisberg Cummings, P.C.

September 25, 2017                    */s/ Derrek W. Cummings*
Date                                  Derrek W. Cummings, Esquire

# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JODY FINEFROCK, JULIA FRANCIS, and SUSAN BARNINGER, individually and on behalf of a collective of others similarly-situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FIVE GUYS OPERATIONS, LLC, | ) ) |
| Defendant. | ) |

Civil Action No. 1:16-cv-01221-SHR

(Judge Sylvia H. Rambo)

### DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND COMBINED INTERROGATORIES

Defendant Five Guys Operations, LLC ("FGO"), by and through its undersigned counsel, provides the following responses to Plaintiffs' Second Combined Interrogatories Directed to Five Guys Operations, LLC.

### RESPONSES TO SECOND SET OF INTERROGATORIES

15.    Describe the process or processes (and the position levels involved in those processes) that Five Guys used during the Class Period to determine the hourly rate of pay or salary wage for the red shirt, shift leader, Assistant General Manager, and General Manager positions.

**RESPONSE:** **FGO objects to the definition of Class Period as defined by Plaintiffs' in their First Combined Interrogatories Directed to Five Guys Operations, LLC ("Plaintiffs' First Interrogatories"). FGO hereby incorporates this objection as a standing objection to all references to the**

"Class Period" in Plaintiffs' Second Combined Interrogatories and FGO's responses thereto. Furthermore, FGO objects to Interrogatory No. 15 as overbroad, not proportional to the litigation, and unlikely, in part, to lead to discovery of admissible evidence. By way of further answer, at no time during the Class Period, as defined by Plaintiffs in Plaintiffs' First Interrogatories, were any of the Plaintiffs employed by FGO as "red shirts" (or Crew Members) or Shift Leaders (or "gray shirts"). Accordingly, the information requested with regard to those positions is irrelevant to the facts and circumstances of this case, and has no ability to make the existence of any of Plaintiffs' allegations more or less probable.

Subject to and without waiving the foregoing objections, District Managers ("DM") determine raises for the General Manager ("GM") and Assistant General Manager ("AGM") positions. The DMs are given a raise pool (*e.g.* 3% maximum) and then determine GM an AGM raises based on performance. The DMs then submit their raise requests to the Director of Operations for their region. The raises are ultimately approved by the Vice President of Operations.

16.   Identify any pay scales or wage scales that Five Guys has had in place for the red shirt, shift leader, Assistant General Manager, and General Manager positions at any time during the Class Period. For each pay scale or wage scale identified, identify the timeframes and geographic locations in which that pay scale or wage scale was in effect.

**RESPONSE**: FGO objects to Interrogatory No. 16 as overbroad, not proportional to the litigation, and unlikely, in part, to lead to discovery of admissible evidence. By way of further answer, at no time during the Class Period, as defined by Plaintiffs in Plaintiffs' First Interrogatories, were any of the Plaintiffs employed by FGO as "red shirts" (or Crew Members) or Shift Leaders (or "gray shirts"). Accordingly, the information requested with regard to those positions is irrelevant to the facts and circumstances of this case, and has no ability to make the existence of any of Plaintiffs' allegations

more or less probable.

**Subject to and without waiving the foregoing objections, FGO states that it has had no pay scales or wage scales in place during the Class Period.**

17.    State with specificity what employee position(s) level(s) within the Five Guys' organization have had the authority to determine the pay rate for the red shirt, shift leader, Assistant General Manager, and/or General Manager positions, respectively, at any time during the Class Period.  For each position identified, identify the applicable timeframes during the Class Period that each position had that ability.

**RESPONSE: FGO objects to Interrogatory No. 17 as overbroad, not proportional to the litigation, and unlikely, in part, to lead to discovery of admissible evidence.  By way of further answer, at no time during the Class Period, as defined by Plaintiffs in Plaintiffs' First Interrogatories, were any of the Plaintiffs employed by FGO as "red shirts" (or Crew Members) or Shift Leaders (or "gray shirts").  Accordingly, the information requested with regard to those positions is irrelevant to the facts and circumstances of this case, and has no ability to make the existence of any of Plaintiffs' allegations more or less probable.**

**Subject to and without waiving the foregoing objections, Defendant incorporates its response to Interrogatory No. 15.**

18.    For each hourly rate of pay or salary wage that Plaintiff Finefrock and Plaintiff Francis received from Five Guys during the Class Period, state with

specificity how each such hourly rate of pay or salary wage was determined and identify the person(s) within the Five Guys organization who made the decision to set the hourly rate of pay or salary wage.

**RESPONSE**: FGO objects to Interrogatory No. 18 as overbroad. Plaintiff Finefrock was employed as a General Manager during the Class Period as defined by Plaintiffs in Plaintiffs' First Interrogatories. Plaintiff Francis was employed as an Assistant General Manager and then promoted to General Manager during the Class Period as defined by Plaintiffs in Plaintiffs' First Interrogatories. Accordingly, they were at all times, during this period, paid on a salary basis.

| Plaintiff | Position | Salary | Date | Reason | Decision maker |
|---|---|---|---|---|---|
| Finefrock | | | | | |
| | AGM | $30,000 | 2/18/13 | Promoted to Assistant General Manager | Andy Cook |
| | GM | $38,000 | 8/19/13 | Promoted to GM | Andy Cook |
| | GM | $38,949.82 | 5/5/14 | Annual raise | Andy Cook |
| | GM | $40,118.78 | 5/4/15 | Annual raise | Andy Cook |
| Francis | | | | | |
| | GM | $40,014.00 | 4/8/13 | Annual raise | Andy Cook |
| | GM | $40,413.88 | 5/5/14 | Annual raise | Andy Cook |

Respectfully submitted,

/s/ *Sarah J. Miley*

Theodore A. Schroeder (PA #80559)
tschroeder@littler.com
Emilie R. Hammerstein (PA #307499)
ehammerstein@littler.com
Sarah J. Miley (PA #318430)
smiley@littler.com
(admitted *pro hac vice*)
**LITTLER MENDELSON, P.C.**
625 Liberty Avenue, 26th Floor
Pittsburgh, PA  15222
412.201.7624/7631/7669
412.774.1959/3756/1489 (fax)

Attorneys for Defendant
Five Guys Operations, LLC

Date:  October 24, 2017

## VERIFICATION

I, Keri Nelson, verify that I am the Director of Compliance and Compensation for Five Guys Enterprises, LLC, that I am authorized to make this Verification on its behalf, and that the foregoing Responses to Plaintiff's Second Set of Interrogatories are true and correct to the best of my knowledge, information and belief, and to the extent based upon information received from others, I believe them to be true and correct. I understand that this Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

Keri Nelson
Director – Compliance and Compensation

Date: 10/24/2017

Firmwide:132517137.1 046550.1026

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of October 2017, a true and correct copy of the foregoing Defendant's Response to Plaintiffs' Second Combined Interrogatories was served via email upon the following counsel of record:

> Larry A. Weisberg
> lweisberg@mwcfirm.com
> Derrek W. Cummings
> dcummings@mwcfirm.com
> McCarthy Weisberg Cummings, P.C.
> 2041 Herr Street
> Harrisburg, PA  17103
>
> George A. Hanson
> hanson@stuevesiegel.com
> Alexander T. Ricke
> ricke@stuevesiegel.com
> 460 Nichols Road, Suite 200
> Kansas City, MO  64112

/s/ *Sarah J. Miley*
Sarah J. Miley

Firmwide:149962899.1 070414.1028

# EXHIBIT 7

KeyCite Red Flag - Severe Negative Treatment
Class Decertified Gordon v. Maxim Healthcare Services, Inc., E.D.Pa.,
July 21, 2017

2014 WL 7008469
United States District Court,
E.D. Pennsylvania.

Markisha GORDON, individually and
on behalf of all others similarly situated

v.

MAXIM HEALTHCARE SERVICES, INC.

Civil Action No. 13–7175.
|
Signed Dec. 11, 2014.

**Attorneys and Law Firms**

Christopher G. Hayes, Law Offices of Christopher G. Hayes, William T. Wilson, MacElree Harvey Ltd., West Chester, PA, Daniel C. Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, for Markisha Gordon.

Andrew G. Sakallaris, Joyce E. Taber, Amanda C. Dupree, Morgan Lewis & Bockius LLP, Washington, DC, Sarah E. Bouchard, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Maxim Healthcare Services, Inc.

*MEMORANDUM*

BARTLE, District Judge.

**\*1** Plaintiff Markisha Gordon ("Gordon") brings this putative class action against her former employer, defendant Maxim Healthcare Services, Inc. ("Maxim"). Gordon, a home healthcare aide, avers that Maxim was late at times in paying her and other employees. Gordon challenges this practice of late payment as a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa. Cons.Stat. Ann. § 260.1 *et seq.* She seeks damages for herself and all others similarly situated. Before the court is the motion of Gordon to certify conditionally a collective action under § 216 of the FLSA to include all Maxim employees in the United States at any time since April 10, 2011 who were not paid on their regular payday for work performed during the applicable pay period.

I.

FLSA violations affecting multiple employees may be redressed in a collective action. 29 U.S.C. § 216(b); *Hoffman–LaRouche v. Sperling,* 493 U.S. 165, 169–71, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Unlike traditional class actions, however, each allegedly wronged employee must elect to join the class of claimants. 29 U.S.C. § 216(b). Due to this "opt-in" requirement, FLSA plaintiffs may be unable to identify other claimants without the benefit of notice to the putative class and discovery. *Sperling v. Hoffman–LaRouche,* 118 F.R.D. 392, 406 (D.N.J.1988), *aff'd* 862 F.2d 439 (3d Cir.), *aff'd* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). As a result, in cases such as this, courts follow a two-step procedure in determining whether to certify a collective action under § 216. *Zavala v. Wal Mart Stores Inc.,* 691 F.3d 527, 536 (3d Cir.2012).

At the first step, the court determines whether the plaintiff has made a preliminary showing that his or her claims are similar to the claims of the members of the putative class. *Symczyk v. Genesis HealthCare Corp.,* 656 F.3d 189, 193 (3d Cir.2011) *rev'd on other grounds by Genesis Healthcare Corp. v. Symczyk,* —— U.S. ——, 133 S.Ct. 1523, 185 L.Ed.2d 636 (2013). The first step usually occurs early in the litigation to facilitate notice and discovery. *Bamgbose v. Delta–T Grp.,* Inc., 684 F.Supp.2d 660, 667– 68 (E.D.Pa.2010). At the second step, typically after the close of class-related discovery, the court reconsiders class certification in light of the more developed factual record. *Id.* at 668.

In this first stage of the analysis, before notice and discovery, we require only that the plaintiffs make a "modest factual showing" that their claims are similar to other potential class members. *Symczyk,* 656 F.3d at 193. That is, "a plaintiff must produce some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected [him or] her and the manner in which it affected other employees." *Id.* (quoting *Smith v. Sovereign Bancorp, Inc.,* Civil Action No. 03–2420, 2003 WL 22701017, at \*3 (E.D.Pa. Nov.13, 2003)). Ultimately the showing must be enough to persuade the court to exercise its "discretionary power ... to facilitate the sending of notice to potential class members." *Id.* at 194 (quoting *Myers v. Hertz Corp.,* 624 F.3d 537, 555 n. 10 (2d Cir.2010)).

**\*2** In the context of FLSA collective actions, "similarity" between class members' claims means that the class members share common "terms and conditions" of employment, which may be shown through the existence of a "common policy, plan, or practice." *Bramble v. Wal-Mart Stores,* Inc., Civil Action No. 09–4932, 2011 WL 1389510, at \*4 (E.D.Pa. Apr.12, 2011). On the other hand, evidence that each class member's claim will hinge on his or her "specific circumstances" weighs against conditional certification. *Id.* We also consider whether the plaintiffs and class members would use the same evidence to prove their claims. *See Bamgbose,* 684 F.Supp.2d at 668–69.

In recognition of the early stage of the case, the burden of making a modest factual showing is "fairly lenient," but it is "not nonexistent." *Camesi v. Univ. of Pittsburgh Med. Ctr.,* 729 F.3d 239, 243 (3d Cir.2013); *Bramble,* 2011 WL 1389510, at \*4 (quoting *Guillen v. Marshalls of MA, Inc.,* 750 F.Supp.2d 469, 480 (S.D.N.Y.2010). Thus, plaintiffs must come forward with some facts from which the court may infer similarities between the plaintiff's claims and those of putative class members. The court may appropriately consider, without weighing the evidence or accepting the substance of any declarations, the totality of the record available to determine whether the plaintiff has met his or her burden. *Bramble,* 2011 WL 1389510, at \*5 n. 6.

## II.

Gordon worked for Maxim as a home healthcare aide from October 2010 to July 2012. Her pay period extended from Sunday through Saturday, and her payday was scheduled for the following week. In her amended complaint, Gordon alleges that on frequent occasions she and other Maxim employees were not paid on the scheduled payday for all of the hours worked in the previous pay period. Rather, Maxim did not compensate her for some hours until several weeks after she worked those hours.

The court previously concluded in ruling on Maxim's motion to dismiss that Gordon's allegations of late payment were sufficient to state a claim for nonpayment of wages under the FLSA. *Gordon v. Maxim Healthcare Servs., Inc.,* Civil Action No. 13–7175, 2014 WL 3438007, at \*3 (E.D.Pa. July 15, 2014). It further determined that

the statute of limitations precluded Gordon from seeking recovery for any wages due on or before April 9, 2011. *Id.* at \*5. Maxim has since produced a 48–page list of all of its hourly employees in Pennsylvania who were paid beyond their scheduled pay dates from April 29, 2011 to April 15, 2012.

Gordon worked remotely at third-party client sites. She has submitted an affidavit that she was paid after her scheduled pay date. Her affidavit details Maxim's requirement that she submit timesheets signed by the clients to whom she was providing care. Maxim required her physically to deliver these timesheets each week to a Maxim office before she could be paid on time. She was not permitted to fax the documents. The closest Maxim office to her home was in Trevose, Pennsylvania, roughly 15 miles away. She did not drive but rather used public transportation. It would usually take Gordon at least one hour and fifteen minutes to make the trip to submit her timesheets and sometimes up to two hours if traveling from more distant client sites.

**\*3** Another affiant, Sandra Cataldi, worked for Maxim from February 2007 to July 30, 2012. She does not state what position she held, although it can reasonably be inferred that Cataldi, like Gordon, worked at remote client sites since she reported to the Maxim offices in York and Harrisburg. Maxim also required her to submit timesheets by hand rather than allowing her to send faxes. She would not be paid on the normal payday for the hours she had worked in the preceding pay period if she did not submit her timesheets in this manner. In addition, she was not permitted to submit to one office the timesheets for work performed out of another office.

Maxim's Employee Handbook simply requires that timesheets be accurately filled out by the employee and signed by an authorized person at the client site. It is silent on how those timesheets are to be collected. Indeed, seven Maxim employees, each from different Maxim offices in Pennsylvania and each responsible for overseeing his or her office's payroll processes, disagree with Gordon's and Cataldi's assertion that they were required to submit timesheets in person. None of these employees has any knowledge of a Maxim policy requiring an employee to turn in his or her timesheet by hand. They further explain that, while faxing the timesheets is sometimes prohibited in order to protect confidential client information, personnel working remotely are permitted in their offices

to submit timesheets by means other than in person, including mail, drop box, or telephone.

### III.

We turn to the question whether Gordon has made a modest factual showing that there is a nexus between her claims and the potential claims of other Maxim employees who were not paid on their regular payday. Gordon argues that her affidavit, the affidavit of Cataldi, and the list of late-paid employees produced by Maxim demonstrate that remote employees worked "under a common policy applicable to all home healthcare aides" which resulted in a systematic failure by Maxim to meet the FLSA requirement of timely payment.

Maxim responds that nothing in either of the plaintiff's affidavits shows that the requirement to deliver timesheets by hand was imposed on anyone other than Gordon and Cataldi. Furthermore, there is no company-wide Maxim policy that controls each office's method of marshaling its employees' timesheets. Thus, according to Maxim, any class action would quickly overburden the court with the management of a profusion of factually dissimilar claims.

Maxim's position does not carry the day. We emphasize that the case is in an early stage and the plaintiff's burden to make a modest factual showing is accordingly lenient. At its core, this case deals with the issue of late payment of employees. *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir.2013). Gordon and Cataldi have filed affidavits that they were not paid on time. We also have in the record a long list of Maxim's hourly Pennsylvania employees who were paid late. We conclude that Gordon at this stage has produced sufficient evidence of a factual similarity between Maxim's payment practices as to her and as to other employees. *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 193 (3d Cir.2011) *rev'd on other grounds by Genesis Healthcare Corp. v. Symczyk*, —— U.S. ——, 133 S.Ct. 1523, 185 L.Ed.2d 636 (2013). A more definite determination whether the putative class is indeed similarly situated can be made at the second step of the FLSA certification framework with the benefit of additional discovery.

**\*4** We still must decide the scope of the putative class. Gordon has given numerous, shifting descriptions of the class she seeks, the broadest of which includes all Maxim

employees anywhere in the United States not timely paid for work during the applicable pay period from April 10, 2011 through the date of trial. Maxim strongly contests such an expansive class definition and argues that it should be limited to home healthcare aides in Pennsylvania.

We agree with Maxim. While Gordon's burden at this stage is lenient, it is not nonexistent. *Bramble*, 2011 WL 1389510, at \*4. She has produced no evidence of any kind concerning Maxim employees outside Pennsylvania. Nor do the affidavits she has submitted suggest any Maxim policy applicable to employees other than home healthcare aides who work outside of the company's offices. Indeed, Gordon herself states in her brief in support of the instant motion that "Maxim, under a policy applicable to *all home healthcare aides*, systematically failed to pay Plaintiff and members of the class on their scheduled [p]ayday." (emphasis added). Accordingly, conditional class certification will be granted only as to all home healthcare aides employed by Maxim in Pennsylvania and who were paid beyond scheduled pay dates that fell on or after April 10, 2011. [1]

[1]    We are unpersuaded by Maxim's contention that this would constitute an impermissible "fail-safe" class, that is, a class the membership of which is defined by a violation of law. Fail-safe classes are frowned upon in Rule 23 cases because a determination of who belongs in the class in turn depends upon a potentially burdensome adjudication of the merits of each prospective member's claim. *See Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279, 291 (D.N.J.2013). This is not of concern in this case where class membership is readily and objectively ascertainable on the basis of payroll records regardless of whether such evidence also speaks to the strength of individual prospective members' cases.

### ORDER

AND NOW, this 11th day of December, 2014, for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that the motion of plaintiff Markisha Gordon for conditional certification pursuant to § 216(b) of the Fair Labor Standards Act (Doc. # 40) is GRANTED insofar as it seeks conditional certification of a class which includes all home healthcare aides employed by defendant Maxim Healthcare Services in Pennsylvania

Gordon v. Maxim Healthcare Services, Inc., Not Reported in F.Supp.3d (2014)

2014 WL 7008469, 23 Wage & Hour Cas.2d (BNA) 1857

and who were paid beyond their scheduled pay dates falling on or after April 10, 2011. The motion is otherwise DENIED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 7008469, 23 Wage & Hour Cas.2d (BNA) 1857

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Hall v. Guardsmark, LLC, Not Reported in F.Supp.2d (2012)

2012 WL 3580086

KeyCite Yellow Flag - Negative Treatment
Distinguished by Goldstein v. Children's Hosp. of Philadelphia, E.D.Pa., February 25, 2013

2012 WL 3580086
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

Patricia HALL and Walter McCombs, on their own
behalf and for all others similarly situated, Plaintiffs,
v.
GUARDSMARK, LLC, Defendant.

Civil Action No. 11–213.
|
Aug. 17, 2012.

**Attorneys and Law Firms**

David J. Cohen, Timothy M. Kolman, Kolman Ely, P.C., Penndel, PA, Lauren C. Fantini, Thomas More Marrone, Caroselli Beachler McTiernan & Conboy, Philadelphia, PA, for Plaintiffs.

Pamela G. Cochenour, Shelly R. Pagac, Pietragallo Gordon Alfano Bosick & Raspanti, Pittsburgh, PA, Daniel J. McGravey, Philadelphia, PA, for Defendant.

*MEMORANDUM AND ORDER*

ROBERT C. MITCHELL, United States Magistrate Judge.

**\*1** Plaintiffs, Patricia Hall and Walter McCombs, bring this action alleging that Defendant, Guardsmark, LLC, violated the Fair Labor Standards Act, 29 U.S.C. §§ 201–19 (FLSA), by requiring them to work as security guards for more than 40 hours per week without submitting such additional time for compensation. They allege that they were required to record only their official shift times, rather than time actually worked; that they were required to be at their post prior to the start of their shift without being compensated for such time; that they were similarly required to remain at their post after their shift ended without being compensated for such time; and that they were required to wear a uniform that they had to clean at home, without being compensated for the time spent on this task.

Presently before the Court for resolution is Plaintiffs' motion for an order authorizing notice to similarly situated persons pursuant to 29 U.S.C. § 216(b). For the reasons that follow, Plaintiffs have failed to demonstrate that they meet the standard for conditional certification and therefore this motion will be denied.

*Facts*

Hall worked as a full-time security guard on various shifts for Guardsmark from August 2008 to July 2009. (Hall Decl. ¶ 2.)[1] McCombs worked as a full-time security guard on various shifts for Guardsmark from August 2006 to August 2008. (McCombs Decl. ¶ 2.)[2] Both Plaintiffs state that Guardsmark disseminated common orders, regulations and instructions to all security officers in two manuals entitled "Guardsmark Means This to You" ("GMTTY")[3] and "General Orders Regulations and Instructions for Uniformed Personnel" ("GORI")[4] and that they were obligated to comply with GMTTY and GORI pursuant to their employment agreements[5]; that Guardsmark maintained a common written policy that required all security officers to track their hours worked by entering their approved shift start and end times on a Daily Activity Report form; that Guardsmark maintained a common written policy that required all security officers to track their hours worked by entering "only the number of hours they were authorized to work" in a "true hours worked" box on the Daily Activity Report; that barring an express authorization of overtime work, all Guardsmark security officers regularly complied with these policies by preparing Daily Activity Reports that showed eight hours worked per shift; that Guardsmark maintained a common written policy that required all security officers to complete a Weekly Time Record form showing the total number of hours each security officer was authorized to work each week; that Guardsmark supervisors regularly complied with this policy by preparing Weekly Time Records that showed they worked eight hours per shift; and that Guardsmark maintained a common practice of paying all security officers on the basis of their assigned shifts (i.e., eight hours per shift) rather than on their actual work start and end times. (Hall Decl. ¶¶ 4–10; McCombs Decl. ¶¶ 4–10.)

1     Pls.' Mot. (ECF No. 49) Ex. A.

Hall v. Guardsmark, LLC, Not Reported in F.Supp.2d (2012)

2012 WL 3580086

2    ECF No. 49 Ex. B.

3    ECF No. 49 Ex. D.

4    ECF No. 49 Ex. C.

5    ECF No. 49 Ex. E.

*2 Plaintiffs state that they worked under a common written policy that required all security officers to arrive early for work so that shift transitions would run smoothly and on time, posts would not experience a lapse in security during shift changes and Guardsmark could minimize overtime hours and wages charged to its clients; that they regularly arrived at work at least 15 minutes before their scheduled shift start time to perform pre-shift work that included receiving pass down instructions, checking equipment, reviewing post orders, collecting schedules, meeting with supervisors, guarding, monitoring, patrolling, inspecting and surveilling; that Guardsmark knew they regularly arrived early because their supervisors regularly suffered and permitted them to perform this work, their supervisors saw them performing this work and regularly reviewed their time and pay records; that Guardsmark did not effectively prevent them from performing "off-the-clock" pre-shift work it did not want performed, accurately track the amount of "off-the-clock" pre-shift work they actually performed or pay all wages they were owed for such work; and that "[f]rom my experience working with and talking to my co-workers, I believe that other Guardsmark security officers were subjected to the same pre-shift policies and procedures, followed them like I did, and, as a result, were denied pay owed for pre-shift work." (Hall Decl. ¶¶ 11–16; McCombs Decl. ¶¶ 11–16.)

Similarly, Plaintiffs state that Guardsmark maintained a common written policy or practice that prohibited all security officers from leaving their post before their approved shift end time so that all security officers would remain on duty throughout their entire shift, be available to provide pass down instructions to their relief workers and so posts would not experience a lapse in security during shift changes; that they regularly worked about 15 minutes past their scheduled shift end time to perform post-shift work that included providing pass down instructions, putting away equipment, reviewing and completing their daily logs and event report and confirming their next work assignment; that Guardsmark knew they regularly stayed at their posts after their authorized shift end-time because their supervisors

regularly suffered and permitted them to perform this work, their supervisors saw them performing this work and regularly reviewed their time and pay records; that Guardsmark did not effectively prevent them from performing "off-the-clock" post-shift work it did not want performed, accurately track the amount of "off-the-clock" pre-shift work they actually performed or pay all wages they were owed for such work; and that "[f]rom my experience working with and talking to my co-workers, I believe that other Guardsmark security officers were subjected to the same post-shift policies and procedures, followed them like I did, and, as a result, were denied pay owed for post-shift work." (Hall Decl. ¶¶ 17–22; McCombs Decl. ¶¶ 17–22.)

*3 Finally, Plaintiffs state that Guardsmark maintained a common written policy that required all security officers to report to work wearing certain standard uniform items; that Guardsmark maintained a common written policy that made all security officers responsible for the care and maintenance of their uniform and equipment items; that Guardsmark maintained a common written policy that required all security officers to keep their uniform neat, clean and well pressed at all times; that Guardsmark maintained a common policy or practice prohibiting its security offices from maintaining their uniform components "on the clock" or at their work sites; that they regularly preformed between one and two (Hall) or between one and three (McCombs) hours of "off-the-clock" uniform maintenance each week without compensation including washing, spot cleaning, drying and ironing their work uniforms and shoes; that Guardsmark knew that its security offices regularly performed "off-the-clock" uniform maintenance work because such work could not be completed during assigned work hours or at assigned work locations, their supervisors regularly suffered and permitted them to perform this work, their supervisors saw the results of this work and regularly reviewed their time and pay records; that Guardsmark did not effectively prevent them from performing "off-the-clock" uniform maintenance work it did not want performed, require its security officers to maintain a contemporaneous record of their uniform maintenance work or pay all wages they were owed for such work; and that "[a]s a result of my experience working with and talking to and observing my co-workers, I believe that Guardsmark's other employees were subjected to the same uniform maintenance work

policies and practices, and affected the same way by them." (Hall Decl. ¶¶ 23–32; McCombs Decl. ¶¶ 23–32.)

Plaintiffs indicate that GMTTY stated that security guards would be assigned a "normal work schedule" of eight hours per day, forty hours per week (GMTTY at 40; Turner Dep. at 36[6]); that Guardsmark's official policy was to pay its employees "for all hours worked" (GMTTY at 12, 40); that the employment agreement indicated that they were prohibited from "reporting to the premises or facilities of a client prior to [their] scheduled starting time" (ECF No. 49 Ex. E ¶ 6); that overtime hours had to be approved in advance (ECF No. 49 Ex. J) and that such hours were tracked by Guardsmark (ECF No. 49 Ex. K); that employees were required to keep track of all hours worked by entering their approved shift start time and end times on a Daily Activities Report (GORI at 20, 85; Turner Dep. at 59–60, 67–69, 73–74); that barring an express authorization of overtime work, Plaintiffs and other security guards complied with these policies by preparing Daily Activities Reports that showed their time worked as eight hours, the length of their assigned shifts (ECF No. 49 Ex. M); that employees were required to complete Weekly Time Record forms showing their total number of authorized hours each week (GORI at 25; ECF No. 49 Ex. L; Martin Dep. at 50–52, 56–58, 85, 133[7]) and that they regularly completed these Weekly Time Records showing that they worked eight hours per shift (ECF No. 49 Ex. O); that Guardsmark maintained a common written policy requiring supervisors to compare the hours recorded on each security officer's Daily Activities Report with the hours recorded on their Weekly Time Records at the end of each week and report any discrepancies between their scheduled hours and their actual hours (Turner Dep. at 104–07; ECF No. 49 Exs. L, P); that Guardsmark used the "approved" shift lengths showing on security officers' Weekly Time Records to calculate their wages (Turner Dep. at 28–32, 71; Martin Dep. at 30–31, 35; ECF No. 49 Ex. Q); that the employment agreement stated that "failure to properly complete Daily Reports that agree with the employee's Weekly Time Record may be cause for Guardsmark to withhold reimbursement to the employee for that period" (ECF No. 49 Ex. E ¶ 14); that Guardsmark maintained a common written policy requiring all security officers to be on post ready to start their tours of duty at the assigned commencement of duty shifts (GORI at 22; Turner Dep. at 21–22, 28–32, 60–61; Martin Dep. at 42–43); that Guardsmark

did not maintain any system or mechanism to cross-check or confirm the actual time that Plaintiffs arrived at their job site or began performing work-related duties (Turner Dep. at 32); that Guardsmark maintained a common policy or practice prohibiting security guards from leaving their posts before their approved shift end time (Turner Dep. at 33–34); that Guardsmark did not maintain any system or mechanism to cross-check or confirm the actual time guards left their job site or stopped performing work-related activities (Turner Dep. at 32); that Guardsmark maintained a common written policy that required security guards to report to work wearing certain "standard uniform items" (GORI at 18; GMTTY at 11; Turner Dep. at 58–59; ECF No. 49 Ex. R); that Guardsmark maintained a common written policy making security guards "responsible for the proper maintenance and care of uniform and equipment items" issued to them (Am. Answer ¶¶ 11(k), 44; GMTTY at 11); that Guardsmark maintained a common written policy requiring security guards to keep their uniform "neat, clean and well pressed at all times" (Am. Answer ¶¶ 11(k), 44; GORI at 162–80; Martin Dep. at 115–17); that Guardsmark maintained a common policy or practice of providing security guards with fewer uniforms than the number of shift they worked each week (Am. Answer ¶ 46); that Guardsmark maintained a common policy or practice of prohibiting security guards from maintaining their uniform components "on the clock" or at their work sites and as a result these chores had to be performed off-the-clock and at home (Martin Dep. at 62, 101, 109–10); and that Guardsmark suffered and permitted regular offthe-clock uniform maintenance (Martin Dep. at 116).

[6]    ECF No. 49 Ex. F.

[7]    ECF No. 49 Ex. N.

**\*4** Defendant does not contest the statements made in its documents. However, it points out that some of the statements in Plaintiffs' declarations are directly contradicted by the testimony they gave at their depositions. For example, at Hall's deposition, the following exchange occurred:

Q. You're testifying that you had to be there 15 minutes early?

A. Every day.

...

Q. Do you recall testifying that you knew the policy was that security officers were not supposed to arrive until the start of their shift?

A. That's their policy, but we were told by Katie Bohnke that we had to be there 15 minutes early because we had to have everything ready at 8.

Q. So you were aware that Guardsmark's policy was that security officers were not supposed to arrive until the start of their shift; correct?

A. That's what their policy said, but we were told to be there 15 minutes early by our main supervisor from Pittsburgh.

Q. Who was that?

A. Katie Bohnke.

...

Q. When did Katie tell you that?

A. The day she hired me.

(Hall Dep. at 14–16.) She also testified that she had no evidence that Bohnke told anyone else to arrive 15 minutes early. (Hall Dep. at 33.) She did not have any interaction with any other security officers at other sites. (Hall Dep. at 99.)

McCombs testified similarly that Bohnke told him the day he was hired that he needed to arrive 15 minutes before his shift began and that he was not permitted to put this information on his time record. (McCombs Dep. at 61–62, 117.) On the other hand, McCombs testified that he never had any discussions with any of his supervisors other than Bohnke about having to report to work 15 minutes early. (McCombs Dep. at 107.) And when McCombs became a supervisor, he never told Hall or any of his other employees that they need to report to work 15 minutes early. (McCombs Dep. at 35–37, 107–08, 109, 115–16; Hall Dep. at 24.) McCombs had no interaction with security guards at other sites. (McCombs Dep. at 105.) Thus, Defendant contends that, despite the assertions made in Plaintiffs' declarations, their actual claim is that Guardsmark's written policies required them to arrive at their shift on time, but Katie Bohnke told them to arrive 15 minutes early and not to put this information on their time records.

With respect to post-shift work, McCombs testified that he was aware that Guardsmark's policy was that security guards were not supposed to stay after their shift was over and they were properly relieved and that he communicated this directive to his subordinate employees. Moreover, he testified that he once disciplined Hall for remaining on her shift after it had ended. (McCombs Dep. at 43–44, 60; ECF No. 58 Ex. 14.)

*Procedural History*
Plaintiff Hall filed this action on February 16, 2011 (ECF No. 1) and on May 26, 2011, she and Plaintiff McCombs filed a First Amended Complaint (ECF No. 17) and McCombs filed his notice of consent pursuant to 29 U.S.C. § 216(b) (ECF No. 18). Following an initial case management conference, the parties conducted discovery on the conditional certification issue. On May 11, 2012, Plaintiffs filed a motion for an order authorizing notice to similarly situated persons pursuant to 29 U.S.C. § 216(b) (ECF No. 49). The motion has been fully briefed and a hearing was held on August 1, 2012.

*FLSA Collective Actions*
 **\*5** The FLSA states that employers who require their employees to work more than forty hours per week must pay them for that excess time at a rate not less than one and one-half times the regular rate at which they are employed. 29 U.S.C. § 207(a)(1). An employee who is not paid for this excess time may bring suit under the FLSA. 29 U.S.C. § 216(b).

As described recently by the Court of Appeals for the Third Circuit:

Enacted in 1938, the FLSA, 29 U.S.C. § 201 et seq., was designed "to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 707 n. 18, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). Under the "collective action" mechanism set forth in 29 U.S.C. § 216(b), an employee alleging an FLSA violation may bring an action on "behalf of himself ... and other employees similarly situated," subject to the requirement that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent

in writing to become such a party and such consent is filed in the court in which such action is brought."

...

In deciding whether a suit brought under § 216(b) may move forward as a collective action, courts typically employ a two-tiered analysis. During the initial phase, the court makes a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff. If the plaintiff carries her burden at this threshold stage, the court will "conditionally certify" the collective action for the purposes of notice and pretrial discovery. In the absence of statutory guidance or appellate precedent on the proper definition of "similarly situated," a divergence of authority has emerged on the level of proof required at this stage. Some trial courts within our circuit have allowed a plaintiff to satisfy her burden simply by making a "substantial allegation" in her pleadings that she and the prospective party plaintiffs suffered from a single decision, plan or policy, but the majority of our circuit's trial courts have required the plaintiff to make a "modest factual showing" that the proposed recipients of opt-in notices are similarly situated. *See Wright v. Lehigh Valley Hosp.*, No. Civ. A 10–431, 2010 WL 3363992, at *3–4, 2010 U.S. Dist. LEXIS 86915, at *7–10 (E.D.Pa. Aug.24, 2010) (canvassing cases).

Under the "modest factual showing" standard, a plaintiff must produce some evidence, "beyond pure speculation," of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees. *See Smith v. Sovereign Bancorp, Inc.*, No. 03–2420, 2003 WL 22701017, at *3, 2003 U.S. Dist. LEXIS 21010, at *10 (E.D.Pa. Nov. 13, 2003). We believe the "modest factual showing" standard—which works in harmony with the opt-in requirement to cabin the potentially massive size of collective actions—best comports with congressional intent and with the Supreme Court's directive that a court "ascertain[ ] the contours of [a collective] action at the outset."

*6 *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192 (3d Cir.2011) (citing *Hoffmann–La Roche, Inc. v. Sperling*, 493 U.S. 165, 172, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) (footnote omitted).[8] "At the step-one inquiry, the Court does not weigh the evidence, resolve factual

disputes, or reach the merits of Plaintiff's claims.... The Court does not, however, review Plaintiff's evidence in a vacuum. It reviews Plaintiff's evidence in light of the evidence submitted by Defendants." *Holley v. Erickson Living*, 2012 WL 1835738, at *4 n. 4 (E.D.Pa. May 21, 2012) (citations omitted). Plaintiffs must " 'make a modest factual showing' that they and potential opt-in plaintiffs 'together were victims of a common policy or plan that violated the law.' " *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir.2010) (citation omitted).

8
  On June 25, 2012, the Supreme Court granted the petition for writ of certiorari in *Symczyk*. 2012 WL 609478 (S.Ct. June 25, 2012). However, the holding in *Symczyk* concerns whether an FLSA collective action becomes moot when the putative representative receives a Rule 68 offer of judgment in full satisfaction of her individual claim prior to moving for conditional certification and no other potential plaintiff has opted into the suit. The substantive law concerning FLSA collective actions is not at issue.

The issue in this case is whether Plaintiffs have satisfied the "modest factual showing" necessary to obtain conditional certification of the proposed collective action.[9] Defendant opposes conditional certification of the "off-the-clock" claims on the following grounds: 1) Hall and McCombs cannot share temporal similarity with other potential plaintiffs because neither of them worked as a security officer for Guardsmark within three years of the date a conditional certification order might be granted (both had left by July 2009); 2) the only declarations they submit are their own, which contain inadmissible hearsay and contradict testimony they gave at their depositions, they have not identified any other potential plaintiffs and in fact they admit that they spoke to no one else, and by contrast Guardsmark has submitted 7 declarations of other individuals who deny their claims; 3) off-the-clock cases are particularly ill-suited to collective action treatment because they require substantial individualized analysis and both Hall and McCombs admitted that they did receive overtime pay when they requested it; 4) they offer no evidence of a directive not to submit additional time other than their allegation that they were told this by supervisor Katie Bohnke at the facility where they worked, and they admit they did not speak to anyone at other Guardsmark offices; 5) they offer no evidence of common duties and in fact each guard job assignment is different; 6) their allegations of pre-shift and

post-shift work is de minimis and since McCombs was Hall's supervisor there is no evidence that Guardsmark "suffered" or "permitted" it; and 7) their pass-on claims are undermined by their own deposition testimony. The Court need not address all of these arguments.

9    While the motion was under advisement, the Court of Appeals issued an opinion deciding that the standard for the *second* stage of a collective action is whether the named plaintiffs have demonstrated, by a preponderance of the evidence, that they are similarly situated to the proposed opt-in plaintiffs based upon an ad-hoc approach considering many factors. *Zavala v. Wal-Mart Stores, Inc.,* 2012 WL 3217522 (3d Cir. Aug.9, 2012). That issue is not presented in this case.

*Temporal Similarity*

Defendant argues that Hall and McCombs would not share temporal similarity with the individuals to whom they propose to send notice because the FLSA requires that plaintiffs opt in within three years of the date they were subjected to the policy that allegedly violated the statute, yet neither Hall nor McCombs was a Guardsmark security guard after July 2009. Plaintiffs respond that the policies at Guardsmark have not changed since that time.

*7 The FLSA requires that actions be filed within two years of a violation, or three years if plaintiffs allege a willful violation of the statute. 29 U.S.C. § 255(a). In the case of a collective action: "For a named plaintiff, the action commences on the date the complaint is filed. 29 U.S.C. § 256(a). For an opt-in plaintiff, however, the action commences only upon the filing of a written consent. *Id.* § 256(b)." *Symczyk,* 656 F.3d at 200. One of the factors for a court to consider in determining whether the named plaintiffs are similarly situated to the proposed class members is "the extent to which the claimed discrimination occurs during different time periods and by different decision-makers." *Karlo v. Pittsburgh Glass Works, LLC,* 2012 WL 1621265, at *13 (W.D.Pa. May 9, 2012) (citation omitted).

Thus, even if notice were to be sent out immediately, no individual could opt into this matter until sometime in August 2012. This would mean that the class would consist of Guardsmark security guards asserting FLSA violations beginning August 2009 and thereafter. However, Hall's employment with Guardsmark ended in July 2009 (Hall Dep. at 36) and McCombs only worked as a security

guard until August 2008 (McCombs Decl. ¶ 2). [10] In addition, Katie Bohnke left Guardsmark in March 2009 (Hall Dep. at 17). Defendant contends that, based on these facts, Plaintiffs have made no showing that the situation at Guardsmark was substantially similar in August 2009 to what it was when Hall and McCombs were employed as security guards. Or, to put the matter slightly differently, the proposed class could not include Hall and McCombs and Plaintiffs have not suggested any other class representative.

10    Although McCombs worked as a supervisor at Guardsmark until July 2009, he acknowledges that he cannot be a class member as a supervisor and only seeks recovery for the time he spent as a security guard until August 2008.

At the hearing, [11] Plaintiffs contended that Defendant was attempting to benefit from the fact that it delayed this case to the point where Hall and McCombs could no longer represent the class. Defendant responds that it raised this issue in a conference call with Plaintiffs' attorneys on January 10, 2012 and that, in a response to a motion to compel filed on February 21, 2012, Defendant requested that "Plaintiffs be ordered to immediately file their Petition for Conditional Class Certification...." (ECF No. 42 at 13.)

11    Plaintiffs' reply brief contained no response to this argument.

Plaintiffs also argue that the "policy" at Guardsmark did not change merely because Katie Bohnke did not work there anymore. However, as Defendant notes, Plaintiffs have provided no basis from which a conclusion could be drawn that supervisors other than Bohnke were instructing other Guardsmark security guards to ignore the company's written policy and arrive at work 15 minutes early. *See Jenkins v. TJX Companies, Inc.,* 2012 WL 109964, at *5 (E.D.N.Y. Mar. 31, 2012) (when plaintiff could only show that he was subjected to an illegal application of a common legal policy, conditional certification denied); *Thompson v. Speedway Superamerica LLC,* 2009 WL 130069, at *2 (D.Minn. Jan.20, 2009) (when plaintiffs did not submit evidence that the reason why they were not compensated for certain tasks was because of a corporate design, but could be because of human error or a rogue store manager, they could not obtain conditional certification).

**\*8** In their most recent filing, Plaintiffs cite two cases from the Eastern District of Pennsylvania, *Holley v. Erickson Living* and *Outlaw v. Secure Health L.P.*, in which, they contend, the courts granted conditional certification based on the plaintiffs' declarations, which were "virtually identical to Plaintiffs' declarations in this case." (ECF No. 65 at 2 n. 1 & Exs. A, C, D, E.) However, as Defendant notes, both Holley and Outlaw were employed at their respective employers within 3 years of the date the conditional certification decisions were issued, and thus the temporal similarity problem was not presented. [12] In addition, Holley stated that all employees were required to punch in to the timekeeping system during a seven-minute window before their start time and Outlaw stated that she was told by *multiple* supervisors and managers to report to work at least ten minutes before their start time (and this allegation was further supported by the time cards submitted); whereas in this case both Hall and McCombs indicated in their depositions that the instructions to report early and only put down "authorized hours" came only from Katie Bohnke.

12    Holley was employed until September 2010 and conditional certification was granted on May 18, 2012 (ECF No. 65 Ex. D ¶ 1); Outlaw was employed until January 27, 2011 and conditional certification was granted on August 2, 2012 (ECF No. 65 Ex. E ¶ 2).

The Court finds Defendant's temporal similarity argument compelling and sufficient to deny Plaintiffs' motion for conditional certification. Plaintiffs have not adequately responded to the argument that their case depends not only on Guardsmark's written policies (which comply with the FLSA), but also on their contention that Katie Bohnke told them in effect to disregard these written policies and work additional time without compensation. They have not explained how they can compare themselves to other employees who worked for Guardsmark after they had left and after Bohnke had left, with no evidence that other supervisors issued the same oral instructions. Nevertheless, the Court will also proceed to analyze Plaintiffs' evidence, which is also found wanting.

*Lack of Support*

Defendant argues that Hall and McCombs have failed to point to any other individuals who would join the proposed collective action because the only declarations they have submitted are their own, which contain hearsay, conflict with the testimony given at their depositions and are contradicted by affidavits Defendant has submitted from 7 other Guardsmark employees. The Court need not address Defendant's evidence, because Plaintiffs bear the burden of demonstrating similarity and their evidence is insufficient to do so.

*Affidavits of Other Employees*

Defendant notes that Plaintiffs have submitted only their own affidavits. In addition, Defendant notes that Hall and McCombs stated at their depositions that they have not talked to any other employees since leaving Guardsmark so they have no knowledge of others interested in joining in the litigation. (Hall Dep. at 16–17; McCombs Dep. at 105.) Plaintiffs respond that there is no "rule" requiring them to proffer a certain number of affidavits of other potential plaintiffs.

**\*9** "A number of factors are relevant at the first step, including whether potential plaintiffs were identified; whether affidavits of potential plaintiffs were submitted; ... whether evidence of a widespread discriminatory plan was submitted; and whether as a matter of sound case management; ... a manageable class exists." *In re: Enterprise Rent–a–Car Wage & Hour Employment Practices Litig.*, 2010 WL 3447783, at*20 (W.D.Pa. Aug. 13, 2010) (Conti, J.) (citations omitted). Judge Conti further noted that: "Many courts finding insufficient evidence of other potential class members at the first step were presented with a nominal number of affidavits that made broad allegations about the treatment of other employees." *Id.* at *21. "Affidavits from potential class members affirming their intention to join the suit are ideal for analysis of whether the 'putative class members were together the victims of a single decision, policy, or plan." *Morales v. Thang Hung Corp.*, 2009 WL 2524601, at *3 (S.D.Tex. Aug.14, 2009) (quoting *Simmons v. T–Mobile USA, Inc.*, 2007 WL 210008, at *9 (S.D.Tex. Jan.24, 2007)).

Plaintiffs' reply to this argument is to contend that "courts in this Circuit do not consider whether the record contains multiple supporting declarations from absent class members in ruling on conditional certification." (ECF No. 62 at 2.) In response to Defendant's citation to Judge Conti's statement in the *Enterprise* case, Plaintiffs argue that:

this reference is significantly undermined by the fact that the court's reliance on class member declarations at conditional certification was based solely on two Michigan district court rulings (from 2004 and 2007), and by the fact that no FLSA opinion filed in Pennsylvania since 2010 has cited this case, affirmed this proposition or held that conditional certification should only be granted where the plaintiff has introduced a sufficient number of class member affidavits.

*Id.* at 3 n. 1.

There are three fundamental errors with this argument. First, the FLSA is a federal law that applies throughout the United States. The only court whose holdings bind this Court is the Court of Appeals for the Third Circuit and the *Symczyk* case has been cited for all relevant points contained therein. Every other opinion—from any federal court—is merely a decision to be considered if it is well-reasoned and aids this Court in reaching a conclusion in this case. There is no such thing as "the law of the Circuit" with respect to considering affidavits from potential plaintiffs. Second, it is of no consequence whether Judge Conti's opinion has been cited frequently, rarely or not at all. And Plaintiffs are incorrect that no FLSA opinion in Pennsylvania refers to the presence of affidavits as a factor to consider. *See Karlo,* 2012 WL 1621265, at *13 (Fischer, J.) (one of the factors is "whether the plaintiffs have sufficiently pled and supported by affidavits, depositions, and the like that defendant's decision-makers have articulated and manifested a clear intent to [engage in policies that violate the statute.]") Third, Plaintiffs' reference to "a sufficient number" of potential plaintiff affidavits is a red herring, because no case holds that a certain number is sufficient. More importantly, they have proffered *no* affidavits, and thus their argument that their evidence cannot be found insufficient because they have not submitted "enough" is a straw man.

**\*10** This Court is *not* holding that Plaintiffs are required to submit the affidavits of other Guardsmark employees who would be potential plaintiffs in order to obtain conditional certification. Rather, the Court is merely

concluding that the presence of such affidavits would bolster Plaintiffs' motion for conditional certification and that the absence of such affidavits weakens their case. *See Bell v. Citizen Fin. Group, Inc.,* 2010 WL 3463300 (W.D.Pa., Sep.2, 2010) (Lancaster, C.J.) (conditional certification granted based on affidavits of 8 opt-in plaintiffs); *Lepkowski v. Telatron Marketing Group, Inc.,* 766 F.Supp.2d 572 (W.D.Pa.2011) (McLaughlin, J.) (conditional certification granted based on affidavits of 9 opt-in plaintiffs); *Burkhart–Deal v. CitiFinancial, Inc.,* 2010 WL 457127, at *4 (W.D.Pa. Feb.4, 2010) (Ambrose, J.) (conditional certification granted based on affidavits of 10 opt-in plaintiffs); *Holley,* 2012 WL 1835738, at *4 (declarations of named plaintiff and one opt-in plaintiff regarding pre-shift work sufficient).

In *Stanislaw v. Erie Indemnity Co.,* 2009 WL 426641 (W.D.Pa. Feb.20, 2009), Judge McLaughlin held that the plaintiff offered only his own affidavit, which contained hearsay insofar as it related to others, and referenced a lawsuit filed by a former co-worker that was dismissed as time-barred and therefore that person could not be considered similarly situated to him. Judge McLaughlin denied the motion for conditional class certification without prejudice. The plaintiff then conducted limited discovery and submitted an amended motion for class certification, which contained deposition testimony from other Material Damage Adjusters who worked in the same location and stated that they worked overtime and were told by their supervisors not to submit it, and the court held that this evidence was sufficient to make a modest factual showing and granted conditional certification. *Stanislaw v. Erie Indemnity Co.,* 2009 WL 3030298 (W.D.Pa. Sep.17, 2009). *See also Williams v. Securitas Security Servs.,* 2011 WL 4544009, at *1 (E.D.Pa. Oct.3, 2009) (refusing reconsideration of order denying conditional certification of pre and post-shift claims based upon "three threadbare declarations" of named plaintiffs); *Khan v. Airport Mgmt. Servs., LLC,* 2011 WL 5597371, at *5 (S.D.N.Y. Nov.16, 2011) (finding it "telling" that, after five months of preliminary discovery, plaintiff was unable to produce a single other individual interested in participating in the case); *Wright,* 2010 WL 3363992, at *4 (conditional certification denied when plaintiff could not name a single other person subjected to defendant's alleged FLSA violations).

As Defendant notes, although this case is at the notice stage, substantial discovery has occurred: four depositions

(two by the Plaintiffs and two by the Defendant), and Plaintiffs have served three sets of interrogatories and three requests for production of documents. (ECF No. 67 Exs. 4, 5). *See Harriel v. Wal–Mart Stores, Inc.*, 2012 WL 2878078, at *5 (D.N.J. July 13, 2012) (examining record as produced in discovery to conclude that plaintiff failed to make a modest factual showing because the "evidence fails to show how the plaintiff *and others* were 'similarly subjected to an improper compensation practice' by the defendant).

### Hearsay

*11 Defendant points out that the declarations of Hall and McCombs contain hearsay as to what they "believe" about other Guardsmark employees. *See* Hall Decl. ¶¶ 16, 22, 32 (she believes that other Guardsmark security officers were subjected to the same pre-shift, post-shift and uniform policies as she was); McCombs Decl. ¶¶ 16, 22, 32 (same). Plaintiffs maintain that they are allowed to rely on such evidence at this stage of the proceedings.

"Only admissible evidence may be considered in deciding a motion for conditional class certification under 29 U.S.C. § 216(b) of the FLSA." *Kuznyetsov v. West Penn Allegheny Health Sys., Inc.*, 2009 WL 1515175, at *3 (W.D.Pa. June 1, 2009) (Ambrose, C.J.) (quoting *Stanislaw*, 2009 WL 426641, at *2. *See also Karlo*, 2012 WL 1621265, at *11; *Wright*, 2010 WL 3363992, at *4; *Ulysse v. Divosta Bldg. Corp.*, 2006 WL 3618449, at *2 (S.D.Fla. Dec.11, 2006); *Harrison v. McDonald's Corp.*, 411 F.Supp.2d 862, 865–66 (S.D.Ohio 2005); *Richards v. Computer Sciences Corp.*, 2004 WL 2211691, at *1 (D.Conn. Sep.28, 2004).

Plaintiffs cite cases that apply a relaxed evidentiary standard and allow the consideration of hearsay at the conditional certification stage. *See Jewell v. Aaron's, Inc.*, 2012 WL 2477039, at *5 n. 6 (N.D.Ga. June 28, 2012); *Zaniewski v. PRRC Inc. .*, 2012 WL 951936, at *6–7 (D.Conn. Mar.20, 2012); *Winfield v. Citibank, N.A.*, 843 F.Supp.2d 397, 402–03 (S.D.N.Y.2012); *Rosario v. Valentine Ave. Disc. Store Co.*, 828 F.Supp.2d 508, 515 (E.D.N.Y.2011); *Jesiek v. Fire Pros, Inc.*, 275 F.R.D. 242, 246–47 (W.D.Mich.2011); *Burdine v. Covidien, Inc.*, 2011 WL 2976929, at *1 (E.D.Tenn. June 22, 2011).

This Court is *not* holding that "the law of this Circuit" prohibits Plaintiffs from relying on hearsay in their affidavits, although it is noted that Plaintiffs have failed to cite a single case from within the Third Circuit that so

holds. Rather, the Court concludes, based upon a review of many decisions discussing this issue, that the better-reasoned line of cases recognizes that hearsay should not be accepted in support of affidavits from the named plaintiffs for class certification. To permit the named plaintiffs to obtain conditional certification by attesting to policies applied to them and then stating that they "believe" other employees were subjected to the same policies would in effect result in automatic preliminary certification, see *Smith v. Sovereign Bancorp. Inc.*, 2003 WL 22701017, at *2–3 (E.D.Pa. Nov.13, 2003), which is at odds with the modest factual showing standard approved of by the Court of Appeals in *Symczyk*.

In addition, and more significantly, Plaintiffs' statements that they "talked" to their coworkers about having to report to work 15 minutes before their shifts started are directly contrary to their deposition testimony. Hall was asked "Did you ever discuss this policy or the fact that Katie had told you to be there 15 minutes early with anyone else?" and she responded "no." (Hall Dep. at 20–21.) McCombs stated that, as a supervisor, he never told Hall or any of his other employees that they needed to report to work 15 minutes early. (McCombs Dep. at 107–08, 115–16; Hall Dep. at 24.) He was asked "Other than Katie Bohnke, did you ever have any discussions with anyone about reporting 15 minutes early?" and "Did you ever tell any of the employees you supervised that they needed to report 15 minutes early?" and he responded "no" to both questions. (McCombs Dep. at 107–08.) He also testified that he never had any discussions with his former supervisors about reporting to work 15 minutes early. (McCombs Dep. at 107.)

*12 Plaintiffs contend that the Court should not determine credibility at this stage of the proceedings. However, the Court is not weighing Plaintiffs' declarations against those proffered by the Defendant to find one set more credible than the other. Rather, the Court is applying the sham affidavit doctrine, which states that "a court will disregard an affidavit that is inconsistent with an affiant's prior deposition testimony ... unless the party relying on the affidavit in opposition to the motion can present a legitimate reason for the discrepancies between the deposition and the affidavit." *Smith v. Johnson & Johnson*, 593 F.3d 280, 285 n. 3 (3d Cir.2010). Plaintiffs signed their declarations on May 11, 2012, but Hall was deposed on November 9, 2011 and McCombs was deposed on November 7, 2011. Thus, to the extent that

the later-filed affidavits contain statements that contradict earlier sworn deposition testimony, Plaintiffs must at least explain the discrepancy. They have not done so and therefore, the statements that they talked to their co-workers will be disregarded.

In conclusion, with respect to Plaintiffs' claims of unpaid pre and post-shift work, they have failed to point to potential plaintiffs who would be temporally similarly situated, they have failed to proffer declarations from potential plaintiffs and they have relied upon their own declarations, which contain hearsay as to other employees and which are directly contradictory to their sworn deposition testimony with no explanation offered for the discrepancy. For all of these reasons, Plaintiffs have failed to make a modest factual showing that they are similarly situated to other potential plaintiffs and their motion for conditional certification relating to pre and post shift work will be denied.

*Washing Uniforms*

Plaintiffs contend that they were required to wear uniforms, that they had to wash these uniforms and that they were not compensated for the time spent on this task. Defendant argues that such time is not compensable under the FLSA and their allegations of a uniform maintenance policy are not susceptible of common proof.

Defendant cites the Department of Labor, Field Operations Handbook, which specifically provides that "the time spent in washing uniforms will not be considered hours worked for either [minimum wage] or [overtime] pay purposes." Department of Labor, Wage and Hour Division, Field Operations Handbook § 30c12(b)(5). In addition, it notes that the FLSA distinguishes between "principal" activities and "preliminary" or "postliminary" activities, the latter of which "occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a)(2). Department of Labor regulations provide that preliminary and postliminary activities include "changing clothes, washing up or showering, and waiting in line to receive pay checks." 29 C.F.R. § 790.7(g). A number of courts have held that "unless the law, the employer, or the nature of the work requires that a preliminary or postliminary activity be performed on the employer's premises, the time spent on such activity is not compensable." *DeKeyser v.*

*Thyssenkrupp Waupaca, Inc.*, 747 F.Supp.2d 1043, 1053 (E.D.Wis.2010); *Bamonte v. City of Mesa*, 598 F.3d 1217 (9th Cir.2010) (because police officers were not required to don and doff their uniforms and gear at the workplace, the time spent doing so was not compensable).

*13 Plaintiffs have not alleged that Guardsmark required them to wash their uniforms at work and in fact both Hall and McCombs state that they were prohibited from maintaining their uniform components "on the clock" or at their worksites. (Hall Decl. ¶ 28; McCombs Decl. ¶ 28.)

In the *Williams* case, the court addressed the claims of the plaintiffs (security guards) for reimbursement for time spent washing their uniforms as follows:

Plaintiffs have not made even a modest factual showing that all Securitas employees in Pennsylvania have similar claims for time spent maintaining their uniforms. Securitas employees explain that they wear a variety of uniforms depending on the need of the particular client whose facility they are guarding. Some clients require Securitas guards to wear a uniform referred to as a "military-style" uniform or alternately as a "hard look" uniform. This uniform consists of a shirt, pants, "bomber"-style jacket, tie, and belt. Other clients request Securitas guards wear a "lobby look" or "soft look" uniform, which consists of a shirt, pants, a blazer, and a tie. Many, possibly all, of the elements in each style of uniform are "wash and wear," meaning that the employee may wash and dry those uniform elements in standard clothes washing machines and clothes dryers. In addition to these two standard uniforms, some clients require Securitas guards to wear "non-standard" uniforms. One example of a non-standard uniform referenced by an employee consisted of a polo shirt provided by either Securitas or the client, and black pants and black shoes supplied by the employee. At some Securitas client sites, employees are not required to wear any uniform at all and wear instead their own business-casual clothing. The array of uniforms worn by Securitas personnel suggests that the time involved in cleaning those uniforms will vary from guard to guard.

Moreover, no one who submitted a declaration to the court, including the plaintiffs, has stated that Securitas required uniforms to be ironed, commercially cleaned, or laundered with a particular frequency. Those guards who do iron their uniforms do so with

differing levels of regularity. Some guards dry clean the "lobby look" blazer and the "military look" jacket, although others said they did not have those items cleaned commercially. The guards that do have the jacket or blazer cleaned professionally do so at varying intervals. Based on the facts before the court, the frequency with which uniforms are cleaned and ironed is entrusted to the individual employee's discretion and, as a result, varies from employee to employee. Thus, the court simply cannot infer that Securitas employees have similar claims for uncompensated time spent maintaining Securitas uniforms. *Bamghose [v. Delta–T Group, Inc.], 684 F.Supp.2d [660,] 670 [ (E.D.Pa.2010) ].*

*Williams,* 2011 WL 3629023, at *5–6 (footnotes omitted). *See also Hawkins v. Securitas Security Servs. USA, Inc.,* 280 F.R.D. 388, 401–02 (N.D.Ill.2011).

*14 Plaintiffs respond that: 1) Defendant is really arguing that they have failed to state a claim upon which relief could be granted and that such an argument is waived given that Defendant has answered the complaint;[13] 2) resolving whether class members wore different uniforms would require delving into the facts of the case which is premature absent discovery; and 3) the declarations Defendant has introduced provide minimal details about employees' uniform maintenance activities which are not entitled to deference and, in any event, competing declarations do not weigh against conditional certification.

13     Plaintiffs are incorrect when they contend that, by filing an answer to the complaint, Defendant has "waived" the argument that their uniform maintenance claim fails to state a claim as such a defense may be presented in a motion for judgment on the pleadings pursuant to Rule 12(c). Nevertheless, they are correct that the viability of their own uniform maintenance claim is not at issue in the context of this, their motion for conditional certification and it will not be discussed herein.

Again, the Court need not refer to Defendant's submissions, because Plaintiffs' submissions are insufficient to make a modest factual showing that similarly situated security guards wore the same uniform and had the same unreimbursed maintenance costs. Hall testified that she washed her uniform (Hall Dep. at 132–34), that all her shirts were washable (Hall Dep. at 138) and in her declaration she does not even state that her uniform was similar to that of any other security officers in Pennsylvania. McCombs stated that he had long and short sleeved shirts and pants, that he washed the short sleeved shirts and that he had the long sleeved shirts and the pants dry cleaned twice a week. (McCombs Dep. at 224–25, 229.) However, he did not indicate that he was *required* to dry clean his uniform or launder it with a particular frequency.

Because the two named plaintiffs do not concur about the uniforms they wore or the maintenance required of them, the Court cannot infer that Guardsmark employees have similar claims for uncompensated time spent maintaining Guardsmark uniforms. As in the *Williams* case, Plaintiffs' evidence of substantial similarity for the uniform maintenance claim is insufficient. Therefore, with respect to the uniform maintenance claim, the motion for conditional certification will be denied.

### ORDER

AND NOW, this 17th day of August, 2012, for the reasons discussed above,

IT IS HEREBY ORDERED that the motion for order authorizing notice to similarly situated persons pursuant to 29 U.S.C. § 216(b), filed by Plaintiffs Patricia Hall and Walter McCombs (ECF No. 49), is denied.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 3580086

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Bramble v. Wal-Mart Stores, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 1389510, 17 Wage & Hour Cas.2d (BNA) 856

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by McKee v. PetSmart, Inc., D.Del., December 9, 2013

2011 WL 1389510
United States District Court,
E.D. Pennsylvania.

Andre BRAMBLE, Jennifer Lynch, on behalf
of themselves and all others similarly situated

v.

WAL–MART STORES, INC., et al.

Civil Action No. 09–4932.
|
April 12, 2011.

**Attorneys and Law Firms**

Joseph H. Meltzer, James A. Maro, Jr., Michelle A. Coccagna, Peter A. Muhic, Robert J. Gray, Barroway Topaz Kessler Meltzer & Check LLP, Radnor, PA, for Andre Bramble, Jennifer Lynch, on behalf of themselves and all others similarly situated.

Robert M. Goldich, Kelly Dobbs Bunting, Greenberg Traurig PA, Philadelphia, PA, Jeannette M. Brook, Greenberg, Traurig LLP, New York, NY, Natalia S. Ballinger, Greenberg Traurig LLP, Denver, CO, for Wal–Mart Stores, Inc., et al.

*MEMORANDUM*

O'NEILL, District Judge.

**\*1** Plaintiffs Andre Bramble and Jennifer Lynch were employed by defendant Wal–Mart Stores, Inc. as Asset Protection Coordinators. Bramble was an APC at a store in Pennsylvania and Lynch was an APC at a store in Massachusetts. On October 27, 2009, plaintiffs filed the instant action alleging that defendant improperly classified and compensated APCs as exempt from overtime pay requirements under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. Plaintiffs seek to assert their claims against defendant in a nationwide collective action on behalf of "similarly situated" APCs pursuant to Section 216(b) of the FLSA.[1] Odis T. Cottrell II, a former APC from Massachusetts,

and Ricardo Beltran, a former APC from California, have filed consent forms to opt-in to this action.[2]

[1]    Similarly situated persons may opt into a suit brought pursuant to FLSA Section 216(b). *See Pereira v. Foot Locker, Inc.*, 261 F.R.D. 60, 62 (E.D.Pa.2009), *citing* 29 U.S.C. § 216(b). This type of suit is called a "collective action," and "is distinguished from the opt-out approach utilized in class actions under Fed.R.Civ.P. 23." *Comer v. Wal–Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir.2006).

[2]    David Rogerson, another former APC from California, also filed a consent form to opt-in to this action. Rogerson was dismissed from the case when he could not be located. Also, on February 17, 2011, following completion of briefing on the present motion for conditional collective certification, plaintiffs filed opt-in consent forms for Michael Krukowski, Brian Otto, Sr., Brian Shoaf and Gina Spadine. Their opt-in forms do not provide any further details about their employment with Wal-Mart (e.g., job title, duration or location) and the parties have not supplied me with any further information about Krikowski, Otto, Shoaf or Spadine.

Now before me are plaintiffs' motion for conditional collective certification,[3] court-authorized notice and production of names and addresses pursuant to 29 U.S.C. § 216(b) and defendant's opposition thereto. I deny plaintiffs' motion for the reasons that follow.

[3]    Plaintiffs seek an order allowing this case to proceed as a collective action on behalf of

All persons who, during the Class period [ (defined as the date three years prior to the date of notice through the present) ]: (i) are/ were employed as Asset Protection Coordinators with Wal–Mart; (ii) are/were not paid overtime compensation at a rate not less than one and one-half times the regular rate for each hour worked beyond forty (40) during a workweek; and (iii) choose to opt-in to this action ....

Pls.' Mot. at ¶ 1. Defendant asserts that the potential opt-in plaintiffs includes at least 5,588 persons from over 3,500 stores throughout the United States. Def.'s Br. at 2.

**I. BACKGROUND**

Defendant uniformly classifies APCs as salaried employees exempt from the overtime requirements of the FLSA.[4] Pl.'s Br., Ex. D. at 5–6. Defendant's job descriptions for the APC position define the essential functions of an APC as being to:

4   The FLSA, exempts from this overtime pay requirement "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Exempt administrative employees are defined as employees who are

(1) [c]ompensated on a salary or fee basis at a rate of not less than $455 per week ... exclusive of board, lodging or other facilities;

(2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3)[w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). The executive exemption applies to any employee

(1) [c]ompensated on a salary or fee basis at a rate of not less than $455 per week ... exclusive of board, lodging or other facilities; (2)[w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3)[w]ho customarily and regularly directs the work of two or more other employees; and (4)[w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

[m]onitor compliance with Company policies and procedures as they pertain to assets, food, health safety, and regulatory compliance as well as local, State, and Federal laws[;][c]onduct internal and external investigations, including the detention of shoplifters[;] [a]nalyze exceptions to monthly P & L, financial and business reports[;][i]mplement and manage processes to ensure goals are met in the areas of safety, asset protection and compliance[; and] [a]nalyze security measures within a facility or facilities to determine effectiveness and needs.

Pls.' Br., Ex. I, at 5; Ex. J, at 5; Ex. K, at 1; Ex. L, at 1. Plaintiffs contend that all APCs are similarly situated in that they are classified as exempt employees and they share the same core responsibilities. They also assert that all APCs are trained by defendant utilizing uniform methodologies and materials, see, e.g., id., Ex. C, at 131:5–131:19 (deposition of Ron Lance, defendant's 30(b)(6) corporate designee), are evaluated under a standardized set of performance objectives, see, e.g., id., Ex. F, at 96:9–99:8 (deposition of Jennifer E. Donley, defendant's 30(b) (6) corporate designee), and are paid a salary in accordance with a standard pay plan, see, e.g., id., Ex. C, at 188:16–189:13. Plaintiffs note that in carrying out their responsibilities all APCs are required to implement a uniform set of mandatory policies and procedures set forth in defendant's "National Priorities" program. See, e.g., id., Ex. C, at 149:13–152:11.[5]

5   Defendant notes that the National Priorities operating procedures were replaced in 2010 with its Shrink and Safety Operating Procedures. Def.'s Br. at 8 n. 26.

Plaintiffs claim that all APCs are misclassified as exempt employees. They contend that regardless of their classification as exempt employees the responsibilities of APCs are not primarily managerial and that they do "not regularly exercise judgment and discretion regarding matters of significance." Compl. ¶ 21. Plaintiffs contend that "APCs do not hire or fire employees at the retail stores where they work and they do not make recommendations that are given significant weight on such matters." Pls.' Mot. at 10. They contend that APCs "do not serve in a supervisory role for other employees" and that APCs "do not establish retail store policies and procedures regarding asset protection." Id. at 11, 12. Instead, plaintiffs assert that APCs spend the majority of their time conducting audits mandated by the National Priorities Program. See Pls.' Br., Ex. G, 48:21–49:20; Ex. H, 29:17–30:8; Ex. P, 98:13–14; Ex. Q ¶¶ 6–8. Accordingly, plaintiffs argue that defendant improperly classified APCs as exempt employees and that they and other similarly situated APCs were or are not adequately compensated for their hours worked.

**\*2** In support of their contention that all APCs are misclassified as exempt plaintiffs produce their own deposition testimony, the deposition of Cottrell and the declaration and deposition of Beltran. See Pls.' Br., Ex. G, 299:9–240:9 (deposition testimony of Bramble that he

did not have the power to fire, demote, or to authorize pay raises); *id.,* Ex. H, 209:3–210:12 (deposition testimony of Lynch that she did not have the power to grant pay raises, direct APA's work responsibility or to hire, fire, promote or discipline employees); *id.,* Ex. P, 214:16–215:21 (deposition testimony of Cottrell that he did not have the power to hire, fire, promote or recommend raises); *id.,* Ex. Q, ¶ 10 (Beltran declaration that he "did not have the authority to hire, fire, promote or demote any Asset Protection Associate"); Pls.' Repl. Br., Ex. X, 137:25–136:4 (deposition testimony of Beltran, same). The deposition testimony of Bramble, Lynch, Cottrell and Beltran is largely specific to their own experiences at Wal–Mart. Plaintiffs have produced little evidence to substantiate their assertions that their responsibilities, as performed, were similar to those actually performed by other APCs, either at their stores or at other stores nationwide. Bramble testified only that APCs "all did the same thing. We all had audits to do. Pretty much everything I—I described, I had to do, we all had to do. There wasn't much deviating from the—you know, what we were supposed to do." Pls.' Repl. Br., Ex. U, 114:12–17. Lynch testified that "[e]very APC did the same thing throughout the company," but when asked if she knew "if certain APCs did everything on this job description" she testified that she "couldn't say that, no." *Id.,* Ex. V, 139:1–10. Although Cottrell testified that he had conference calls and meetings with other APCs and that he could email them for assistance if needed, *id.,* Ex. W, 209:4–210–12, his testimony does not include any information to support an inference that the work experiences of other APCs were or are similar to his own experience. Beltran's declaration states only that "I believe my experience at Wal–Mart was typical of other APC's. For example, the APC's I worked alongside with at other stores performed the same type of work as I did and also worked long hours each week." *Id.,* Ex. Q, ¶ 16.

Defendant contends that plaintiffs' alleged experiences as APCs are not reflective of the class of APCs as a whole because their "claims of misclassification rest upon their alleged performance of duties not contained within the APC job description." Def.'s Br. at 2. In support of its contention that plaintiffs' work experiences are not representative of the work experiences of other APCs, defendant has provided the Court with declarations from twenty-three APCs employed at various stores in Pennsylvania, Massachusetts and California. *Id.,* Ex. E. Many of the declarations submitted by defendant describe

in detail the managerial functions that each declarant performs or performed as an APC, including hiring, firing, training, administering performance evaluations. *See, e.g., id.,* Ex. F (summarizing responsibilities of APCs as identified in the APC declarations submitted by defendant). Defendant also submits declarations from four current or former Regional Asset Protection Managers who oversee defendant's Asset Protection functions within an assigned region, *id.,* Ex. C, declarations from five current or former Market Asset Protection Managers who directly supervise APCs within an assigned market (a subset of a region), *id.,* Ex. D, Tabs 2–6, and the declaration of one store manager, *id.* Ex. D, Tab 1. These declarations confirm that APCs are generally responsible for programs to ensure shrink reduction, safety, compliance and security. They describe managerial functions ordinarily performed by APCs under their supervision as including hiring, training, supervising and evaluating Asset Protection Associates, managing theft and accident investigations and the development and implementation of strategies to reduce shrink. Defendant further asserts that while all APCs share these same duties "they do not all perform those duties in the same manner, at the same level of involvement, or with the same frequency." Def.'s Br. at 10. Defendant cites to the twenty-three proffered declarations of APCs to highlight variations that may exist between the daily responsibilities of APCs due to factors including variations in store size, geographic region and circumstances unique to individual locations. *Id.,* Ex. G. (summarizing variations in APC experiences based on information in submitted declarations). Defendant's evidence regarding the ordinary job responsibilities of APCs as including hiring, firing, training, supervising, establishing policies or other tasks that would support defendant's determination to classify the APC position as exempt from the FLSA's overtime pay requirements largely contradicts plaintiffs' assessments of their own job responsibilities.

\*3  In further support of its contention that plaintiffs' work experiences are not representative of those of other APCs, defendant also asserts that the Wage and Hour Department of the U.S. Department of Labor "examined the APC job description and policies, investigated the day-today duties and responsibilities of the APC position, interviewed numerous APCs, and conducted further follow-up interviews ..." in conjunction with a 2006 audit of approximately 30 of defendant's stores. Def.'s Br.,

Ex. M. The Department of Labor concluded that APCs "actually performing the full range of duties contained in the APC position description" would properly qualify for an exemption from the FLSA's overtime provisions. *Id.*

## II. STANDARD FOR CONDITIONAL CERTIFICATION OF A FLSA COLLECTIVE ACTION

The FLSA requires employers to pay time-and-a-half for employee labor exceeding forty hours per week. 29 U.S.C. § 207. Under 29 U.S.C. § 216(b) employees who believe their right to unpaid overtime compensation has been violated may maintain a collective action on their own behalf and on behalf of all similarly situated employees. Plaintiffs who allege that they are misclassified as exempt from FLSA's overtime pay requirements may seek collective certification. *Woodard v. FedEx Freight East, Inc.,* 250 F.R.D. 178, 191 (M.D.Pa.2008) ("district courts often conditionally certify misclassification cases"). Collective action treatment affords plaintiffs 'the advantage of lower individual costs to vindicate rights by the pooling of resources.' " *Morisky v. Pub. Sev. Elec. and Gas Co.,* 111 F.Supp.2d 493, 496 (D.N.J.2000), *quoting Hoffman–La Roche, Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). " 'Collective action treatment under § 216(b) [also] reflects a policy in favor of judicial economy by which 'the judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.' " *Holt v. Rite Aid Corp.,* 333 F.Supp.2d 1265, 1269 (M.D.Ala.2004). *quoting Hoffman–La Roche,* 493 U.S. at 170.

Courts in the Third Circuit follow a two step procedure in determining whether a plaintiff's claims may proceed as a collective action. *Smith v. Sovereign Bancorp, Inc.,* No. 03–2420, 2003 WL 22701017 (E.D.Pa. Nov.13, 2003) ("The determination of whether FLSA claimants are 'similarly situated' for the purposes of § 216(b) is a two-step procedure."); *Stillman v. Staples, Inc.,* No. 07–849, 2008 WL 1843998, at *3 (D.N.J. Apr.22, 2008) ("A collective action has two stages, namely the conditional certification and notice stage and the final certification stage."). "The first step is assessed early in the litigation process when there is minimal evidence and places a relatively light burden on plaintiffs to show that potential opt-in plaintiffs are 'similarly situated.' " *Pereira,* 261 F.R.D. at 62

(citations omitted). "The second step is usually conducted at the close of class-related discovery and consists of a specific factual analysis of each employee's claim to ensure that each proposed plaintiff is an appropriate party." *Harris v. Healthcare Servs. Grp., Inc.,* No. 06–2903, 2007 WL 2221411, at *2 (E.D.Pa. July 31, 2007).

\*4 The present motion implicates the first step of this analysis. At the first step, I am required to determine whether the proposed collective consists of similarly situated employees to whom notice of the collective action should be sent. *Guillen v. Marshalls of MA, Inc., ——* F.Supp.2d ——, 2010 WL 4627851, at *5 (S.D.N.Y. Nov.16, 2010) (internal quotation and citations omitted) ("at this preliminary stage, the focus of the inquiry is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated"). The phrase "similarly situated" is not defined in the FLSA, "and neither the United States Supreme Court nor the Court of Appeals for the Third Circuit provide direct guidance on determining whether potential class members are similarly situated." *Pereira,* 261 F.R.D. at 62. The phrase "contemplates individuals 'employed under the same terms and conditions.' " *Craig v. Rite Aid Corp.,* No. 08–2317, 2009 WL 4723286 (M.D.Pa. Dec.9, 2009), *quoting Woodard v. FedEx Freight East. In.,* 250 F.R.D. 178, 190–91 (M.D.Pa.2008). However, "the mere classification of a group of employees—even a large or nationwide group —as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Colson v. Avnet, Inc.,* 687 F.Supp.2d 914, 927 (D.Ariz.2010). The right to proceed collectively may be foreclosed where "an action relates to specific circumstances personal to the plaintiff rather than any generally applicable policy or practice." *Basco v. Wal–Mart Stores, Inc.,* No. 00–3284, 2004 WL 1497709 (E.D.La.. Jul.2, 2004), *quoting Burt v. Manville Sales Corp.,* 116 F.R.D. 276, 277 (D.Colo.1987).

There is disagreement as to the quantum of proof that plaintiffs must offer in order to establish that they are sufficiently similarly situated with putative opt-in plaintiffs to warrant conditional certification. *See Wright v. Lehigh Valley Hosp.,* No. 10–431, 2010 WL 3363992, at *3 (E.D.Pa. Aug.24, 2010). I find that plaintiffs must support their request for conditional certification with

"a basic or modest factual showing that the proposed recipients of opt-in notices are similarly situated to the named Plaintiff[s]." *Id.* "Mere allegations" are not sufficient where, as here, "discovery has commenced, and the parties submit deposition testimony, declarations, and other evidence in support of their respective positions[. A]mplication of the more stringent test is appropriate." *Williams v. Owens & Minor, Inc.,* No. 09–00742, 2009 WL 5812596, (E.D.Pa. Oct.09, 2009), *citing Pereira,* 261 F.R.D. 60, 63.

The modest factual showing test is a lenient standard. *Morisky v. Pub. Serv. Elec. and Gas Co.,* 111 F.Supp.2d 493, 497 (D.N.J.2000) (citation omitted). Plaintiffs must "provide 'a sufficient factual basis on which a reasonable inference could be made' that potential plaintiffs are similarly situated." *Andrako v. United States Steel Corp.,* No. 07–cv–1629, 2009 WL 2855662, at *3 (W.D.Pa. Sept.2, 2009), *quoting Mueller v. CBS, Inc.,* 201 F.R.D. 425, 428 (W.D.Pa.2001). Plaintiffs must "provide some 'modest' evidence, beyond pure speculation, that Defendant's alleged policy affected other employees." *Smith,* 2003 WL 22701017, at *2 (E.D.Pa. Nov.13, 2003); *see also Holt,* 333 F.Supp.2d at 1270 ("[A] plaintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions."). Although plaintiffs' burden to establish a right to conditional certification is modest, it is "not nonexistent and the factual showing, even if modest, must still be based on some substance." *Guillen,* 2010 WL 4627851, at *9; *see also Colson,* 687 F.Supp.2d at 929–30 ("Although the burden for certifying a FLSA lawsuit for collective action notification is light, there are limits, and the district court cannot function as a rubber stamp for any and all claims that come its way under this statute."); *Bunyan v. Spectrum Brands, Inc.,* No. 07–0089, 2008 WL 2959932 (S.D.Ill. Jul.31, 2008) ("the 'modest factual' showing does require at least some minimal support for Plaintiffs' allegation that they, along with potential plaintiffs, are similarly situated in their job duties and their compensation plan"). In order to "avoid the 'stirring up' of litigation through unwarranted solicitation" conditional certification should be denied where plaintiffs fail to satisfy their burden. *White v. Osmose, Inc.,* 204 F.Supp.2d 1309, 1318 (M.D.Ala.2002), *quoting Brooks v. BellSouth Telecomm., Inc.,* 164 F.R.D. 561, 567 (N.D.Ala.1995); *see also Burkhart–Deal v. Citifinancial, Inc.,* No. 07–1747, 2010 WL 457127, at *5

(W.D.Pa., Feb.04, 2010) (holding that given the "dearth of evidence" to support plaintiff's claims of substantial similarity to a nationwide class "any court-facilitated notice to a nationwide opt-in class would constitute little more than solicitation on behalf of Plaintiffs cause").

## III. DISCUSSION

**\*5** I must decide whether plaintiffs have made a modest factual showing that they and other APCs nationwide, the potential members of the collective action plaintiffs seek to assert, are similarly situated. For the purposes of plaintiffs' FLSA misclassification claim, "similarly situated" must be "analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt." *Morisky,* 111 F.Supp.2d at 498; *see also* 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's ... duties meet the requirements of the regulations" implementing the FLSA.). Plaintiffs argue that they are similarly situated to APCs nationwide because, as APCs they were uniformly classified as exempt from the FLSA's overtime pay requirements, were tasked with similar responsibilities, underwent similar training and were subject to standardized salary and evaluation policies. In contrast, defendant contends that what binds the claims of Bramble, Lynch, Cottrell and Beltran together is their assertion that they performed non-exempt duties. [6] Plaintiffs do not point to a job description that says that APCs are required to perform non-exempt tasks for a majority of their working hours. "Instead, the Plaintiffs are arguing that as a matter of fact, rather than of formal job description, they are performing non-[exempt] duties for the majority of their working hours." *Holt,* 333 F.Supp.2d at 1271; *see also Guillen,* 2010 WL 4627851, at *6 (denying plaintiff's motion for conditional certification where plaintiff's claim that he spent most of his time performing non-exempt managerial tasks was "very different from an attack on a common formal policy"). "It is only once the Plaintiffs' testimony as to the degree to which other tasks are performed that the application of the exemption becomes questionable ." *Holt,* 333 F.Supp.2d at 1271.

6    Plaintiffs primarily rely on their own declarations and depositions as evidence that all APCs are

similarly situated. However, defendant has also presented contrary declarations of APCs who have not consented to sue. "[R]ather than rely merely on the evidence presented by the Plaintiffs, it is appropriate to examine all of the relevant evidence." *Holt v. Rite Aid Corp.,* 333 F.Supp.2d 1265, 1274 (M.D.Ala.2004). I am "not weighing evidence, or accepting the substance of the Declarations submitted by the Defendant over the substance of any testimony submitted by the Plaintiffs." *Id.* As in *Holt,* the issues here revolve around whether the day-today tasks of APCs are consistent with their designation as exempt. I "must necessarily examine evidence of the job duties actually performed" by APCs. *Id.*

The deposition testimony of Bramble, Lynch, Cottrell and Beltran and Beltran's declaration provide only limited evidence from which I may conclude that APCs nationwide are similarly situated to plaintiffs with respect to plaintiffs' allegation that the work they perform or performed should not qualify for an exemption to the FLSA's overtime pay requirement. "In spite of the modest evidentiary standard applicable at this stage, courts have not hesitated to deny conditional certification when evidence is lacking ." *Kronick v. Bebe Stores, Inc.,* No. 07–4514, 2008 WL 4546368, at *2 (D.N.J. Oct.2, 2008). The Court in *Guillen,* 2010 WL 4627851, at *6–7, declined to grant conditional certification where plaintiff's showing that he was "similarly situated to the proposed plaintiffs with respect to his allegation that he spent most of his time performing non-managerial tasks" was "extremely thin." The Court found that plaintiff's argument

> *6 boil[ed] down to the proposition that where there is a corporate management structure that applies to all regions of the country—as is likely true for many, if not most companies that operate nationally—any single employee may plausibly assert that employees are similarly situated with respect to that employee's day to day job requirements even if those job activities contravene the company's stated requirements.

*Id.* at *7. Here, plaintiffs' do not provide even modest evidence beyond their own speculation that "the evidence of the Plaintiff[s'] job duties is [not] merely anecdotal evidence specific to them [and] can be

more broadly applied." *Holt,* 333 F.Supp.2d at 1272; *see also Kronick,* 2008 WL 4546368, at *3 (denying motion for conditional certification where "[p]laintiffs assert generalized assumptions and effectively assume a similar situation for themselves and the prospective class"); *Armstrong v. Weichert Realtors,* No. 05–3120, 2006 WL 1455781, at *1–2 (D.N.J. May 19, 2006) (denying plaintiff's motion for conditional certification where plaintiff presented no specific evidence that others in his position were required to perform unpaid overtime work); *cf. Garcia v. Freedom Mtge. Corp.,* No. 09–2668, 2009 WL 3754070, at *3 (D.N.J. Nov.2, 2009) (granting conditional certification where plaintiffs' evidence regarding the factual nexus between their situation and that of the proposed class members included affidavits detailing their own experiences and their observations of the experiences of their co-workers).

Further, courts considering claims similar to those of plaintiffs have declined to grant conditional certification where consideration of the propriety of an employer's application of an exemption to its employees would require an individualized or fact intensive analysis. *See Evancho v. Sanofi–Aventis U.S. Inc.,* No. 07–2266, 2007 WL 4546100, at *5 (D.N.J. Dec.19, 2007) (declining to grant conditional certification to a proposed collective of pharmaceutical representatives where the evidence submitted by the parties indicated that employee responsibilities "may vary among plaintiffs and potential collective action members"); *Aguirre v. SBC Communications, Inc.,* No. 05–3198, 2007 WL 772756, at *15 (S.D.Tex. Mar.12, 2007) ("the fact-intensive nature of the exemption analysis" coupled with plaintiffs' acknowledgment that employee duties varied between individuals was sufficient to deny preliminary collective action certification); *Forney v. TTX Co.,* No. 05–6257, 2006 WL 1030194, at *3 (N.D.Ill. Apr.17, 2006) (declining to grant conditional certification where "certification of a collective action would require determination on whether each potential claimant's qualifications satisfy the regulatory requirements [for a FLSA exemption]. This determination would be fact-intensive and individualized."). Conditional certification of a nationwide collective action is inappropriate where allowing the parties claims to proceed collectively will not provide for "the economy of scale envisioned by the FLSA collective action procedure," *Holt,* 333 F.Supp.2d at 1275.

**\*7** In *Holt* the Court denied conditional certification where defendant classified assistant manager and store manager plaintiffs as exempt executive employees and plaintiffs claimed that they were misclassified because they "perform the same tasks as hourly employees, and [ ] the only task which Store Managers can perform and hourly shift supervisors cannot perform is the hiring/recommending of entry level employees." 333 F.Supp.2d at 1269. The "written job descriptions for Store Managers and Assistant Store Managers contain[ed] many managerial tasks." *Id.* at 1271. The application of the exemption became questionable only after considering the plaintiffs' testimony regarding how often they performed non-managerial tasks. *Id.* As here, the defendant in *Holt* presented declarations from store managers and assistant managers that were inconsistent with the evidence submitted by the plaintiffs as to whether they primarily performed exempt tasks. *Id.* at 1274. The Court found that it could not conclude that a nationwide group of Store Managers and Assistant Managers was similarly situated where

> substantial evidence [had] been presented which indicate[d] to [the] court that, if the case were conditionally certified as a collective action at [the first] stage, the court would have to inquire at a second stage as to the daily tasks of each putative collective action member to determine whether they are similarly situated to the persons identified by the Plaintiffs, and then, on the merits, whether they had suffered an FLSA violation because they were not eligible for overtime compensation.

*Id.* at 1274–75.

Similarly, in *Babin v. Stantec, Inc.,* No. 09–1160, 2010 WL 3363920 (E.D.Pa., Aug.25, 2010), the Court declined to grant conditional certification under the modest factual showing standard to a proposed class of "designers" alleged to have been misclassified as exempt. In support of his motion, plaintiff supplied notices from three potential opt-in plaintiffs, declarations from two experts purportedly demonstrating that "all designers-regardless of discipline, specialty, training or expertise-perform the same primary duties and functions" and an admission from defendant's corporate designee that all designers perform the same common duties. *Id.* at \*3. Defendant argued that plaintiff was not representative of the class he sought to represent and that there were substantial differences among designers. *Id.* at \*4. The Court found that

> [w]hile designers may share certain general job functions-including preparing or reviewing project designs, drawings, calculations, and documentation-that alone is insufficient to establish that designers are similarly situated. Rather, determining whether an employee is properly classified as overtime-exempt as an executive, administrative, or professional employee requires identifying the employee's "primary duty"-not just the employee's generalized job functions-and determining how much time the employee spends performing both exempt and non-exempt work."

**\*8** *Id.* at \*4

In *Mike v. Safeco Insurance Company of America,* 274 F.Supp.2d 216 (D.Conn.2003), plaintiff was an insurance claims representative who had been classified as an exempt employee under the exemption for administrative employees. Plaintiff claimed that even though his job description listed administrative and non-administrative tasks, he "spent the majority of his time ... performing non-administrative tasks, and therefore he should not be considered an administrative employee." *Id.* at 220. The Court denied conditional certification of plaintiff's claims, holding that where plaintiff "spent the balance of his time performing non-administrative functions despite the fact that his job description calls for him to perform some administrative functions," he was effectively challenging his individual treatment, rather than defendant's overarching classification policy. *Id.* at 221. The Court found that where it "would have to engage in an ad hoc inquiry for each proposed plaintiff to determine whether his or her job responsibilities were similar to" plaintiff's there was "no way ... to conclude that resolution of the claims of many plaintiffs at the same time would be sensible." *Id.*

2011 WL 1389510, 17 Wage & Hour Cas.2d (BNA) 856

Although plaintiffs and the putative opt-ins share the same job title and essentially the same job description, an analysis of plaintiffs' claim that APCs are misclassified as exempt would require an individualized inquiry as to whether the tasks in fact performed by each putative collective action member are or were similar to the tasks that plaintiffs claim they performed and which render them more appropriately classified as non-exempt employees. Based on the sparse evidence submitted to support plaintiffs' contention that all APCs similarly performed non-exempt tasks, I find that plaintiffs have not met their modest burden to proceed collectively with an action on behalf of APCs nationwide. "[L]itigating this case as a collective action would be anything but efficient. The exempt or non-exempt status of potentially [thousands] of employees would need to be determined on ... an employee-by employee basis." *Morisky,* 111 F.Supp.2d at 499. Accordingly, I will deny plaintiffs' motion.

An appropriate Order follows.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1389510, 17 Wage & Hour Cas.2d (BNA) 856

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Ellis v. Common Wealth Worldwide Chauffuered
Transp. of NY, LLC, E.D.N.Y., March 23, 2012

2009 WL 1515175
United States District Court,
W.D. Pennsylvania.

Andrew KUZNYETSOV, et al., Plaintiffs,

v.

WEST PENN ALLEGHENY HEALTH
SYSTEM, INC., et al., Defendants.

Civ. A. No. 09–CV–379.
|
June 1, 2009.

**Attorneys and Law Firms**

J. Nelson Thomas, Michael J. Lingle, Patrick J. Solomon,
Justin M. Cordello, Thomas & Solomon LLP, Rochester,
NY, for Plaintiffs.

Alexandra Bak-Boychuk, David S. Fryman, John B.
Langel, Shannon D. Farmer, Ballard Spahr Andrews
& Ingersoll, LLP, Philadelphia, PA, Edward T. Groh,
Ballard Spahr Andrews & Ingersoll, LLP, Voorhees, NJ,
Robert B. Cottington, W. Scott Hardy, Cohen & Grigsby,
P.C., Pittsburgh, PA, for Defendants.

*MEMORANDUM ORDER OF COURT*

AMBROSE, Chief Judge.

**\*1** Plaintiffs filed a Motion for Expedited Collective
Action Notification for their Fair Labor Standard
Act ("FLSA") claim that the Defendants' Meal Break
Deduction Policy is unlawful under 29 U.S .C. § 216(b) of
the FLSA. (Docket No. 3). Specifically, Plaintiffs argue
that Defendants' practice of automatically deducting
thirty minutes from employees' recorded time after five
or six hours worked violated the FLSA. Therefore,
Plaintiffs seek an order conditionally certifying the
class and court approved notice to all current and
former hourly employees of Defendants who were
subject to the automatic pay deduction. Plaintiffs also
seek the following: A list, provided by Defendants, of
each employee's name, current or last known address,
telephone number, social security number, location of

employment, dates of employment, date of birth, and e-
mail address of all current and former employees who
are/were subject to the Meal Break Deduction Policy;
Notices and opt-in forms to be posted by Defendants
in a conspicuous place at Defendants' locations where
employees can see such notices during the pendency of
the lawsuit; Notices and opt-in forms to be e-mailed
to employees; and Notices to be publicized five times
in Defendants' employee newsletter or other employee
communication.

**A. *Conditional Certification***

**1. Requirements**
The FLSA mandates employers to pay employees at least
the minimum wage for all hours worked. 29 U.S.C. §
201, *et seq.* The FLSA permits employees to maintain
collective action under 29 U.S.C. § 216(b) on their own
behalf and on behalf of all similarly situated employees.
Plaintiffs have petitioned to proceed collectively against
Defendants for automatic meal break wage deductions
that occurred when work was performed during that time
under 29 U.S.C. § 216(b). In relevant part, this section
authorizes collective actions against employers:

> by any one or more employees
> for and in behalf of himself or
> themselves and other employees
> similarly situated. No employee
> shall be a party plaintiff to any such
> action unless he gives his consent in
> writing to become such a party and
> such consent is filed in the court in
> which such action is brought.

29 U.S.C. § 216(b); *Sperling v. Hoffman La–Roche, Inc.,*
862 F.2d 439, 444 (3d.Cir.1988) (two requirements for
§ 216(b) class action are that employees are similarly
situated and each class member file individual consent to
opt-in).

The FLSA does not define the term "similarly situated"
and neither the United States Supreme Court nor
the Court of Appeals for the Third Circuit provide
direct guidance on determining whether potential class
members are similarly situated. In the absence of definitive
precedent, district courts in the Third Circuit have
developed a two-stage test. *Kronick v. bebe Stores,* No.
07–4514, 2008 WL 4546368, at 1 (D.N.J. Oct.2, 2008).

During the initial notice stage, the court determines whether a class should be conditionally certified for the purpose of notice to potential opt-in plaintiffs and for pretrial discovery regarding their individual claims. *Mueller v. CBS, Inc.*, 201 F.R.D. 425, 428 (W.D.Pa.2001); *Stanislaw*, at 1, citing, *Mooney v. Aramaco Servs. Co.*, 54 F.3d 1207,1213–14 (5th Cir.1995). In so doing, the court preliminarily determines whether the proposed class consists of similarly situated employees. *Smith v. Sovereign Bancorp*, No. 03–2420, 2003 WL 22701017, at 2 (E.D.Pa. Nov.13, 2003). Courts generally examine the pleadings and affidavits of the parties to decide whether the proposed class members are similarly situated, *see Aquilino v. Home Depot, Inc.*, No. 04–4100, 2006 WL 2583563 at 1 (D.N.J. Sept. 7, 2006), and utilize a "fairly lenient" standard in rendering such a determination. *Pontius v. Delta Financial Corporation*, No. 04–1737, 2005 WL 6103189, 3 (W.D.Pa., June 24, 2005). *See also De Asencio v. Tyson Foods*, 130 F.Supp.2d 660, 663 (E.D.Pa.2001) (at first tier, plaintiffs have "fairly low burden" to prove similarly situated requirement). If the plaintiff meets the requisite showing, the class is conditionally certified for the purpose of notice and discovery. *Armstrong v. Weichert Realtors*, No. 05–3120, 2006 WL 1455781, at 2 (D.N.J. May 19, 2006). Once the class is conditionally certified, notice is given to the potential plaintiffs so that they may elect whether to opt-in to the action. *Stanislaw*, at 1.

\*2 In the second stage of class certification, after the court is more fully informed through discovery, the defendant may move to decertify the class on the basis that the "similarly situated" standard has not been met and the court makes its final certification decision. *Sperling*, 826 F.2d at 444; *Pontius*, at 3. The present matter involves a stage one analysis.

The district courts in this Circuit do not unanimously agree on the appropriate level of proof for a stage one determination that potential class members are similarly situated. Some courts confer conditional certification and notice if a plaintiff advances an allegation that he and the proposed class members were victims of a single employer policy. *De Asencio*, 130 F.Supp.2d at 663; *Goldman v. Radio Shack Corp.*, No. 03–0032, 2003 WL 21250571, at \*8 (E.D.Pa. April 16, 2003). Under this evidentiary approach, preliminary certification is granted upon a mere allegation that the putative class members were injured by a single policy of the defendant employer.

*Id.* (conditional certification requires only lax showing of similarly situated). Others courts apply a more exacting, yet still relaxed, test requiring the plaintiffs to show a modest factual nexus between their situation and that of the proposed class members. *Aquilino*, at 2; *Smith*, at 2; *Armstrong*, at 2 (conditional certification issue determined under "modest factual showing" standard); *Bishop v. AT & T Corp.*, No. 08–468, 2009 WL 763946, 2–3 (W.D.Pa. March 23, 2009); *Stanislaw v. Erie Indem. Co.*, No. 07–1078, 2009 WL 426641, 1–2 (W.D.Pa. Feb.20, 2009); *Dreyer v. Altchem Environmental Services, Inc.*, No. 06–2393, 2006 WL 3676013, at 2 (D.N.J. Dec.12, 2006) (plaintiffs must show factual nexus between their situation and situations of other employees); *Bond v. National City Bank of Pennsylvania*, 2006 WL 1744474, 4 (W.D.Pa. June 22, 2006); *Smith*, at 2.–3.

In *Smith*, the district court observed that the mere allegation test contradicted the design of the FLSA's opt-in requirement to limit the size of collective actions, and chose to adopt the modest factual showing approach. *Id.* at 2–3. This evidentiary standard requires a plaintiff to show "a factual nexus between their situation and the situation of other current and former [employees] sufficient to determine that they are 'similarly situated.' " *Aquilino*, at 1 (citation omitted). The *Smith* court described this standard of proof, as a "more stringent-although nonetheless lenient-test that requires the plaintiff to make a 'modest factual showing' that the similarly situated requirement is satisfied." *Id.* at 2 (citation omitted); *see*, *Mueller*, 201 F.R.D. at 428 (requiring plaintiff to provide "a sufficient factual basis on which a reasonable inference could be made" that potential plaintiffs are similarly situated); *Bosley v. Chubb Corp.*, No. 04CV4598, 2005 WL 1334565, 3 (E.D. Pa. June 3, 2005). I agree with the reasoning of those courts that have required "modest factual showing" approach. This approach "enables a court to narrow the potential class from all of a defendant's employees to just those employees who can possibly" have a claim under the same policy as allegedly affected Plaintiffs. *Smith*, at 3.

**2. Affirmations and Opt–In Consent Forms**

\*3 To support their position, Plaintiffs submit the affirmations of six employees all of whom were nurses: Andrew Kuznyetsov, Charles Boal, Marthann Heilman, Annamarie Finucan, Daranette Smiley–McKeithen, and Maxine Thomas. (Docket No. 5, ¶¶ 12–18). The affirmations are substantially similar. *Id.* at ¶¶ 13–18,

Kuznyetsov v. West Penn Allegheny Health System, Inc., Not Reported in F.Supp.2d...

2009 WL 1515175, 157 Lab.Cas. P 35,587

Docket Nos. 5–7 through 5–12). Therein, they assert that they are employees of Defendants and that they, and all hourly employees, were subjected to an automatic pay deduction of 30 minutes from pay checks after 5 hours worked in shift. (Docket Nos. 5–7 through 5–12, ¶¶ 3–4). They further contend that they, and others like them, were not paid when they were required to work through, or during part of, their 30 minute meal breaks, nor did Defendants ensure that they received their full meal break. (Docket Nos. 5–7 through 5–12, ¶¶ 5–40).

Defendants argue that the affirmations are fatally flawed because: 1) they only allege that they worked through meal periods as a result of patient care needs, while they are seeking conditional class certification for all hourly employees, even though there are employees who do not perform any patient care services; and 2) they fail to disclose whether the affiants have personal knowledge as it relates to situations surrounding the generalized "other employees" discussed in the affidavits and, therefore, contain inadmissable hearsay. [1] (Docket No. 68, pp. 4–5, 26–28). With regard to the first argument, I disagree with Defendants that the affiants only allege that they worked through meal periods as a result of patient care needs. To the contrary, they also assert that they work through meals due to staffing issues. (Docket Nos. 5–7 ¶ 12; 5–8, ¶ 12; 5–9, ¶ 12; 5–10, ¶ 12; 5–11, ¶ 12; and 5–12, ¶ 12. Consequently, I do not find merit to this argument.

[1] Specifically, Defendants argue that the affirmations are fatally flawed in that they failed to: 1) disclose that affiants have personal knowledge as to whether the employees they observed working were supposed to be on a bona fide meal break; 2) state that the affiants have personal knowledge of whether such employees followed West Penn's policies and procedures for canceling the automatic meal break deduction; 3) state that the affiants have personal knowledge of whether such employees were paid for working through their meal breaks; and 4) state that Plaintiffs, affiants, or anyone of the 12,000 proposed class members were denied minimum wage or payment for overtime. (Docket No. 68, pp. 12, 27–28).

With regard to Defendants' hearsay argument, however, I agree with Defendants that the information contained in the affirmations relating to "other employees" is inadmissible hearsay.

Only admissible evidence may be considered in deciding a motion for conditional class certification under 29 U.S.C. § 216(b) of the FLSA. See, e.g., Dreyer v. Altchem Environmental Services, Inc., 2007 U.S. Dist. LEXIS 71048 at *7 (D.N.J.2007) ("courts will not consider affidavits that are not founded on personal knowledge"); Ulysse v. Divosta Bldg. Corp., 2006 U.S. Dist. LEXIS 89414 at *4, 2006 WL 3618449 (S.D.Fla.2006) (hearsay in plaintiff's affidavit disregarded); Harrison v. McDonald's Corp., 411 F.Supp.2d 862, 865–866 (S.D.Ohio 2005) ("hearsay statements cannot be considered in connection with a Plaintiff's § 216(b) motion for the purpose of determining whether other employees are similarly situated"); Richards v. Computer Sciences Corp., 2004 U.S. Dist. LEXIS 19637 at *4, 2004 WL 3517039 (D.Ct.2004) (hearsay statements in affidavit in support of motion pursuant to 29 U.S.C. § 216(b) will be stricken). In Harrison, for example, the court denied conditional certification because the plaintiff's statement that "other employees also said they had complained to management [about] not getting paid for all of the hours they had worked" was based upon inadmissible hearsay. Id. at 865.

*4 Stanislaw, at 2. While I recognize that Plaintiffs' evidentiary burden at this stage is light, the evidence I consider must be admissible evidence. Id. Since the information contained in the affirmations relating to "other employees" is not based on personal knowledge, the evidence is inadmissible hearsay. As a result, I will not consider the hearsay statements contained therein.

Defendants also argue that the opt-in consent forms are so vague and ambiguous that they lack any probative value on the issue of similarly situated. (Docket No. 68, pp. 24–26). After a review of the same, I agree. The opt-in consent forms merely state the Defendant for which they worked and that they consent to participate in the lawsuit. See, e.g. Docket Nos. 11–16, 18–25, 45, 50, 59–61, and 67. They provide no information to allow me to determine if they are similarly situated to Plaintiffs as it relates to the meal break deduction policy claim. Consequently, I find they hold no evidentiary value in my determination.

This does not end the inquiry, however. There still may be sufficient evidence at this stage to permit conditional certification.

### 3. The Policies

In October 2006, Defendants implemented a system called KRONOS which automatically deducts thirty minutes of time from each non-exempt employee's pay for every five to six consecutive hours worked, depending on the location. West Penn Allegheny Health System's ("West Penn") policy provides as follows:

> Meal Periods are not considered as hours worked. Work schedules of eight (8) hours or greater shall provide for an uninterrupted, unpaid meal period of at least one-half (½) hour during each work schedule. If the employee is required to perform any job-related duties during the meal period, the time is to be paid.

(Docket No. 68–5, p. 18). After May 2006, West Penn changed its policy to provide for an unpaid meal period of thirty minutes after every five or six hours worked, depending on the employee's location. (Docket No. 68–5, ¶ 13). A similar policy exists for the Western Pennsylvania Hospital (WPH) and Canonsburg General Hospital ("CGH"). (Docket No. 68–5, pp. 20, 26). If these employees miss a meal break, then the employee must inform one of the timekeepers of the need to cancel the automatic deduction. (Docket No,. 68–5, ¶ 16). The manner of informing the timekeepers varies between locations and departments. *Id.* at ¶ 17.

Allegheny General Hospital ("AGH") also has a policy for meal time for non-exempt employees. Under a collective bargaining agreement ("CBA"), AGH employees are afforded "[o]ne (1) thirty (30) minute meal time per shift, if the shift is a minimum of five (5) hours, ... and shall not be counted as time worked." (Docket No. 68–3, p. 6). The CBA further provides that employees who are unable to take the thirty minute meal break shall notify their manager using the established process in place for that department. (Docket Nos. 68, p. 13; 68–4, ¶ 3, 68–4, p. 6). Notification is accomplished by completing and submitting a "blue card." (Docket No. 68–4, ¶ 5).

**\*5** Thus, according to Defendants, all of the policies at issue apply to all non-exempt employees and require the employees to inform/notify another of the need to cancel the automatic deduction. However, the U.S.

Dept. Labor, Employment Standards Administration, Wage and Hour Division, Fact Sheet # 53 provides that "[w]hen choosing to automatically deduct 30–minutes per shift, the employer must ensure that the employees are receiving the full meal break." U.S. Dept. Labor, Employment Standards Administration, Wage and Hour Division, Fact Sheet # 53—The Health Care Industry and Hours Worked. (Docket No. 5–6, p. 2); *see also,* 29 C.F.R. § 785.13 ("Duty of management. In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so."); *see also,* 29 C.F.R. § 785.19. Arguably, Defendants' policies shift the responsibility to the employees. Consequently, I find this evidence is sufficient at this stage to proceed with conditional certification.

In opposition, Defendants assert that Plaintiffs failed to identify a common policy or plan that violates the FLSA and, therefore, cannot demonstrate that they are "similarly situated" to putative class members. (Docket No. 68, pp. 20–23). Specifically, Defendants argue that since the implementation of KRONOS, over 413,659 automatic meal break deductions were cancelled for 7476 non-exempt employees. *Id.* at 18. In fact, all of the named Plaintiffs, with the exception of Maxine Thomas, who retired from AGH prior to the implementation of KRONOS, had the automatic meal deductions cancelled multiple times. (Docket No. 68–5, ¶¶ 19–24). Defendants also argue that the CBA provides that "[f]requent, ongoing missed meal periods will be reviewed and resolved through the Labor/Management committee" and that since October of 2006, the union at AGH has not raised a single grievance concerning the failure to pay for a missed meal period. (Docket Nos. 68–4, ¶¶ 3, 7; 68–4, p. 6).). Neither argument, however, alters the fact that the policies apply to all non-exempt employees and arguably shifts the responsibility to the employees to ensure that the deduction is cancelled. [2]

---

[2]   This does not mean that ultimately the policies may not be found to be "lawful," as Defendants argue. Rather, it means that at this preliminary stage, I find sufficient evidence to permit conditional certification.

Case 1:16-cv-01221-SHR   Document 44-5   Filed 12/13/17   Page 108 of 112

**Kuznyetsov v. West Penn Allegheny Health System, Inc.,** Not Reported in F.Supp.2d...

2009 WL 1515175, 157 Lab.Cas. P 35,587

Defendants are correct that the FLSA does not require employers to make meal breaks available. When an employer chooses to automatically deduct thirty minutes per shift, however, the Department of Labor suggests that "the employer must ensure that the employees are receiving the full meal break." U.S. Dept. Labor, Employment Standards Administration, Wage and Hour Division, Fact Sheet # 53—The Health Care Industry and Hours Worked. (Docket No. 5–6, p. 2).

Finally, Defendants argue that Plaintiffs' claims are not suitable for collective action treatment because they require individualized inquiries but, if they are, they should be limited to nurses having patient care responsibilities at the same facilities as the Plaintiffs. (Docket No. 68, pp. 28–35). At this initial stage, there is no dispute that the policies affect all non-exempt employees, regardless of job title or work location. Any dissimilarities may be reevaluated in the second stage of class certification, after discovery is complete. *Sperling,* 826 F.2d at 444; *Bishop,* at 5; *Pontius,* at 3. Consequently, I find that initial conditional certification is warranted.

### B. Notification

**\*6** With regard to notification, Plaintiffs seek the following:

1) A list, provided by Defendants, of each employee's name, current or last known address, telephone number, social security number, location of employment, dates of employment, date of birth, and e-mail address of all current and former employees who are/were subject to the Meal Break Deduction Policy;

2) Notices and opt-in forms to be posted by Defendants in a conspicuous place at Defendants' locations where employees can see such notices during the pendency of the lawsuit;

3) Notices and opt-in forms to be e-mailed to employees; and

4) Notices to be publicized five times in Defendants' employee newsletter or other employee communication.

I agree with Defendants that Plaintiffs' notice proposals are improper and the content of the proposed notices is objectionable. (Docket No. 68, pp. 38–42). First, I find

that first-class mail is appropriate as the sole form of notice.

> In contrast [to first-class mail], electronic communication inherently has the potential to be copied and forwarded to other people via the internet with commentary that could distort the notice approved by the Court. Electronic mail heightens the risk that the communication will be reproduced to large numbers of people who could compromise the integrity of the notice process. In addition, email messages could be forwarded to nonclass members and posted to internet sits with great ease. First class mail ensures, at the outset, that the appropriately targeted audience received the intended notification and maximizes the integrity of the notice process.

*Reab v. Electronic Arts, Inc.,* 214 F.R.D. 623, 630–31 (D.Colo.2002). Plaintiffs have not provided any reason why first-class mail would be inadequate in this case. Therefore, notification in this case will be limited to first-class mail only.

Second, the personal information requested by Plaintiffs exceeds that which is necessary and appropriate. The information that will be required to be produced, therefore, is limited to the names and mailing addresses of non-exempt employees. Telephone numbers shall be provided for the sole purpose of running "reverse directory checks for putative members with outdated addresses and not to make calls to prospective class members." *Bishop,* at 6. Said information shall be provided to Plaintiffs within sixty (60) days. A protective order is hereby entered limiting the use of telephone numbers to an address verification devise.

Third, I further order Plaintiffs' counsel to immediately cease and desist any form of notification not pre-approved by the court.

Fourth, I agree with Defendants that the opt-in period should be limited. (Docket No. 68, p. 41). I find, however, that a sixty (60) day opt-in period is reasonable.

Fifth, I agree with Defendants that the content of the proposed notice is objectionable. (Docket No. 68, pp. 41–42). I find Defendants' request that I afford the parties the opportunity to develop and agree upon the contents of a notice to be approved by this court to be reasonable. If the parties cannot agree upon the contents, the parties shall cross-file proposed notices. Said submission must be filed within thirty (30) days of the date of this order.

### C. Appointment of Class Counsel

*7 Plaintiffs request that the law firm of Dolin, Thomas & Solomon LLP ("DTS") be appointed class counsel.

(Docket No. 4, pp. 32–34). Defendants do not oppose this request. *See,* Docket No. 68. Consequently, I appoint DTS as class counsel.

THEREFORE, Plaintiffs' Motion for Expedited Collective Action Notification (Docket No. 3) is granted in part and denied in part as set forth above.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 1515175, 157 Lab.Cas. P 35,587

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works

2009 WL 5812596
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. Pennsylvania.

Loretta R. WILLIAMS
v.
OWENS & MINOR, INC.

Civil Action No. 09-00742.
|
Oct. 9, 2009.

**Attorneys and Law Firms**

Peter D. Winebrake, R. Andrew Santillo, The Winebrake Law Firm LLC, Dresher, PA, for Loretta R. Williams.

Sarah E. Bouchard, Angeli Murthy, Christopher Havener, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Owens & Minor, Inc.

***ORDER***

JAN E. DuBOIS, District Judge.

**\*1  AND NOW,** this 9th day of October, 2009, upon consideration of Plaintiff's Motion for Conditional Certification (Document No. 12, filed May 27, 2009); Plaintiff's Supplement to Pending Motion for Conditional Certification (Document No. 17, filed August 12, 2009); Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Conditional Certification (Document No. 20, filed August 21, 2009); Plaintiff's Reply Brief in Further Support of Her Motion for Conditional Certification (Document No. 23, filed August 27, 2009); Plaintiff's Second Supplement to Her Pending Conditional Certification Motion (Document No. 24, filed September 16, 2009); and Defendant's Memorandum of Law in Further Opposition to Plaintiff's Motion for Conditional Certification (Document No. 25, filed September 21, 2009), the Court, having conducted a telephone conference with the parties, through counsel, on October 8, 2009, to address the pending motion, **IT IS ORDERED** that Plaintiff's Motion for Conditional

Certification is **GRANTED** as to the proposed class of hourly employees who worked through all or part of their meal breaks at any time between January 1, 2008 and August 3, 2009, and, as a result of defendant's meal break policy, were not paid for such work. [1]

[1]  Plaintiff's Complaint alleges that defendant maintained a policy of automatic thirty-minute meal break pay deductions from February 19, 2006 to February 20, 2009. However, in the course of preliminary discovery, plaintiffs learned that such a policy was only in place between January 2008 and August 3, 2009, and that different meal break policies were in effect before and after this period. Plaintiffs, through counsel, agreed in the telephone conference that plaintiffs were seeking conditional certification only as to the employees affected by the meal break policy in effect between January 2008 and August 3, 2009.

**IT IS FURTHER ORDERED** as follows:

(1) The Scheduling Order of June 4, 2009 is **VACATED.**

(2) Within 10 days of the issuance of this Order, the parties, through counsel, shall submit to the Court (Chambers, Room 12613) an agreed-upon form of notice to be sent to potential class members. The notice shall provide, *inter alia,* for a 45 day period during which the noticed individuals may opt-in to the collective action.

(3) At the conclusion of the notice period, the parties, through counsel, shall jointly report to the Court regarding the number of class members, and submit to the Court a proposed amended scheduling order which tracks the intervals between proceedings set forth in the Scheduling Order of June 4, 2009, with the addition of a schedule for the filing of a final certification motion and response.

The Court's ruling upon Plaintiff's Motion for Conditional Certification is based on the following:

1. Plaintiff Loretta Williams filed this action against defendant Owens & Minor, Inc. in the Eastern District of Pennsylvania on February 20, 2009, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.,* and the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. § 333.101, *et seq.* Williams alleges that she has worked for defendant, on assignment at

the Children's Hospital of Philadelphia ("CHOP"), on an hourly pay basis from April 2006 to present, excepting only a four month period of maternity leave in 2008. (Compl.¶ 11-15.) She now contends that between January 2008 and August 3, 2009, she was subject to an automatic deduction of pay for a daily thirty-minute meal break, regardless of whether she worked through that period. (Compl. ¶ 17; telephone conference of October 8, 2009.) Williams seeks conditional certification of a class of all current and former hourly employees of defendant assigned to CHOP who worked through all or part of their meal breaks at any time between January 1, 2008 and August 3, 2009, and, as a result of the meal break policy, were not paid for such work. To date, two additional hourly employees of defendant have filed declarations opting-in to the action-Frederick Zimmerman and Andre Dingle.

*2  2. Pursuant to the Joint Stipulation and Order of this Court of June 9, 2009, plaintiffs and defendant have engaged in initial discovery pertaining to conditional certification. Plaintiffs have provided the Court with declarations, depositions, and documents relating to meal break policies in support of their motion. Defendant has challenged plaintiffs' evidence with further deposition testimony and declarations from nine other employees who claim never to have worked through a meal break without due compensation.

3. FLSA provides for collective actions by employees against employers who violate the statute, subject to two requirements: (1) the employees must be "similarly situated"; and (2) they must give "written consent." 29 U.S.C. § 216(b). The Supreme Court has held that "Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated" grants a district court the "requisite procedural authority to manage the process of joining multiple parties" in an orderly and sensible manner. *Hoffmann-La Roche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Thus, district courts have "discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) ... by facilitating notice to potential plaintiffs." *Id.* at 169.

4. FLSA does not define the term "similarly situated," and neither the Supreme Court nor the Third Circuit has directly addressed the meaning of the phrase. Courts in the Eastern District of Pennsylvania have adopted a two-step procedure for examining a proposed collective

action. In the first stage, the district court makes a "preliminary inquiry into whether the plaintiff and the proposed group are similarly situated. This inquiry occurs early in the litigation when minimal evidence is available to the court." *Parker v. NutriSystem, Inc.,* No. 08-1508, 2008 WL 4399023, at *1 (E.D.Pa. Sept.26, 2008). In the second stage, which takes place after discovery is complete, the court conducts a "factual analysis of each employee's claim to ensure that each proposed plaintiff is an appropriate member of the collective action." *Lugo v. Farmer's Pride Inc.,* No. 07-cv-00749, 2008 WL 638237, at *3 (E.D.Pa. Mar.7, 2008). In making its second stage determination, the court "require[s] a higher level of proof than was necessary at the first stage for conditional certification." *Id.* The present motion implicates the first of these two steps.

5. Courts in the Third Circuit are divided on the issue of the appropriate standard for certification of a collective action at the first stage. Some courts have found that a "mere allegation" that other putative plaintiffs have been harmed by an offending policy of an employer is sufficient to warrant conditional certification. *See, e.g., Goldman v. RadioShack Corp.,* No. 2:03-CV-0032, 2003 WL 21250571 (E.D.Pa. Apr. 16, 2003); *Felix de Asencio v. Tyson Foods, Inc.,* 130 F.Supp.2d 660, 663 (E.D.Pa.2001); *Sperling v. Hoffman-La Roche,* 118 F.R.D. 392, 407 (D.N.J.1988), aff'd on other grounds, 862 F.2d 439 (3d Cir.1988), aff'd 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). Other courts have applied a stricter standard, requiring the plaintiff to "make a 'modest factual showing' that the similarly situated requirement is satisfied." *Bosley v. Chubb Corp.,* No. 04CV4598, 2005 WL 1334565, at *3 (E.D. Pa. June 3, 2005); *see also, Smith v. Sovereign Bancorp, Inc.,* No. 03-2420, 2003 WL 22701017, at *3 (E.D.Pa. Nov.13, 2003); *Parker,* 2008 WL 4399023, at *2; *Pereira v. Foot Locker, Inc.,* No. 07-cv-2157, 261 F.R.D. 60, 2009 WL 2951028, at *3 (E.D.Pa. Sept.11, 2009). Even where courts have applied the more onerous test, they emphasize that it is still an "extremely lenient standard." *Parker,* 2008 WL 4399023. at *2.

*3  6. This Court concludes that the plaintiffs' motion should be evaluated under the "modest factual showing" standard. Where discovery has commenced, and the parties submit deposition testimony, declarations, and other evidence in support of their respective positions, application of the more stringent test is appropriate. *Pereira,* 261 F.R.D. 60, 2009 WL 2951028, at *3; *Bishop*

Williams v. Owens & Minor, Inc., Not Reported in F.Supp.2d (2009)

2009 WL 5812596

v. AT & T Corp., 256 F.R.D. 503, 507 (W.D.Pa.2009). Thus, the plaintiff is required to "provide some 'modest' evidence, beyond pure speculation, that Defendant's alleged policy affected other employees." *Smith,* 2003 WL 22701017, at *3. While not evaluating the merits of plaintiff's case, the Court must determine "whether plaintiff's proposed class consists of similarly situated employees who were collectively 'the victims of a single decision, policy, or plan ...' " *Lugo,* 2008 WL 638237, at *3 (quoting *Ruehl v. Viacom, Inc.,* 500 F.3d 375, 388 (3d Cir.2007)).

7. Plaintiffs have provided sufficient evidence of similarly situated employees to satisfy the "modest factual showing" standard for conditional certification. Specifically, Williams and the two opt-in plaintiffs state in sworn declarations and deposition testimony that they frequently worked through meal breaks and were not paid. (Williams Dep. at 79-80, 120-26; Zimmerman Dep. at 48, 101-04; Dingle Dep. at 40, 59-60.) Furthermore, all three plaintiffs report that other employees of defendant complained that they also worked through unpaid meal breaks. (Williams Dep. at 50-52, 54-55; Zimmerman Dep. at 13-14, 84-85; Dingle Dep. at 69-71.) In addition,

deposition testimony of a corporate representative of defendant, Carole Lawson, demonstrates that there was a policy of an automatic thirty-minute meal break pay deduction in place between January 2008 and August 3, 2009, and that it applied to all hourly employees of defendant. (Lawson Dep. at 46-50.) Defendant concedes that such a uniform meal break policy was in effect during the period of January 2008 to August 2009. (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. at 4-5.)

8. Though the Court takes note of the nine declarations filed by employees of defendant challenging plaintiff's claims, precedent makes clear that, in ruling on the motion for conditional certification, it is not appropriate to adjudicate plaintiffs' claims on the merits. The Court finds that the plaintiffs have made a sufficient factual showing to warrant conditional certification of the proposed class, and defers ruling on the size and scope of any class until discovery is complete and the issue of final certification is before the Court.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 5812596

---

End of Document · © 2017 Thomson Reuters. No claim to original U.S. Government Works.